**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**THE OHIO WILLOW WOOD COMPANY,**

   **Plaintiff,**

          **Case No. 2:04-cv-1223**
          **JUDGE GREGORY L. FROST**
  **v.**        **Magistrate Judge Mark R. Abel**

**ALPS SOUTH, LLC,**

   **Defendant.**

<u>**OPINION AND ORDER**</u>

In this civil action, Plaintiff, the Ohio Willow Wood Company ("OWW"), filed suit for

patent infringement and related claims against Defendant, Alps South, LLC ("Alps"). Alps filed

a counterclaim for inequitable conduct against OWW. The matter of Alps' counterclaim came

on for a trial to the Court from July 30, 2014 through August 1, 2014. For the reasons that

follow, the Court finds in favor of Alps and accordingly enters judgment in Alps' favor on its

counterclaim for inequitable conduct.

  **I.**   **BACKGROUND**

The facts in this case are set forth in more detail in the Court's August 10, 2012 Opinion

and Order (ECF No. 209) and the Federal Circuit's November 15, 2013 Opinion and Order (ECF

No. 226). The Court briefly summarizes those facts below.

  **A.  Procedural History**

OWW is the owner of United States Patent No. 5,830,237 (the "'237 patent"), which

involves technology related to coverings for amputees employing a prosthesis. The relevant

claim discloses a device in the form of a cushioned sock that fits over a residuum, or an

1

amputation stump, and that features a gel coating on the interior surface of the sock. The critical date for purposes of patent validity is March 5, 1995.

Defendant Alps is a prosthetics company that makes and sells liners for use with prosthetics. Alps' product line also includes stretchable fabric covers lined with gel.

Non-party Silipos, Inc. ("Silipos") is a competitor of both OWW and Alps. In the early 1990's, Silipos manufactured and sold a product called the Silosheath, which featured a nylon fabric covering with a gel coating on the interior surface. Because the Silosheath was made of nylon, the gel was known to bleed through to the exterior surface of the covering and cause problems for the user. Both Silipos and Alps claim that Silipos also manufactured and sold products before March 5, 1995, that were similar to the Silosheath but did not allow gel to bleed through to the exterior surface of the fabric. One product in particular, the Single Socket Gel Liner ("SSGL"), is at the heart of this lawsuit.

OWW commenced this action in 2004 and alleged that Alps infringed the '237 patent. In response, Alps argued (among other things) that the '237 patent was invalid because Silipos' products predated it. Alps also filed a counterclaim against OWW for inequitable conduct in initially prosecuting the '237 patent.

On July 20, 2005, the parties jointly moved for a Protective Order, which the Court approved and signed. (ECF No. 18.) The stated purpose of the Protective Order was "to limit the disclosure and dissemination of the parties' as well as third parties' confidential and proprietary information that will be exchanged during discovery." (ECF No. 17, at 1.) The Protective Order provides that documents and deposition transcript marked with the terms "CONFIDENTIAL" or "CONFIDENTIAL – FOR TRIAL COUNSEL ONLY" shall not be produced to anyone other than persons designated as "Qualified Persons" thereunder.

The parties engaged in discovery, which included the deposition of non-party Jack Fay. Mr. Fay was the president of Thermo-Ply, Inc. ("Thermo-Ply"), a competitor of OWW. Mr. Fay testified during his deposition that Thermo-Ply's gel liners that he made and sold predated and invalidated the '237 patent (the "Fay Liners").

On September 22, 2006, Alps filed a motion for summary judgment with several corresponding exhibits. (ECF Nos. 59–62.) Both the motion and corresponding exhibits were filed under seal with the label "FILED UNDER SEAL PURSUANT TO AGREED PROTECTIVE ORDER." Several of the deposition excerpts had been designated as "Confidential" or "Confidential – Trial Counsel Only" during the depositions.

Certain exhibits to Alps' summary judgment motion are of particular importance to the procedural history of this case. First, Alps attached to its motion testimony of a former Silipos executive named Jean-Paul Comtesse, who testified that, *inter alia*, Silipos manufactured products (including the SSGL) prior to March 5, 1995, that were similar to the Silosheath but did not allow gel to bleed through to the exterior of the fabric and that the SSGL was constructed using an impermeable fabric called "Coolmax." (ECF No. 60-3.) Second, Alps attached declarations from three non-parties knowledgeable in the field, Jack E. Uellendahl, Robert S. Gailey, Jr., and James McElhiney, all of which purport to suggest that Silipos did, in fact, manufacture and sell pre-critical date prosthetic liners with gel on only one side of the fabric. (ECF Nos. 60-14, 60-15, & 60-17.)

Shortly after submitting its summary judgment motion, on October 5, 2006, Alps requested the first ex-parte reexamination of the '237 patent. Alps submitted several pages of materials, including references to Silipos' products and Mr. Comtesse's full deposition transcript, to the United States Patent and Trademark Office ("PTO") as part of that request.

3

The Court then stayed this litigation.  (ECF No. 80.)  The Court simultaneously denied Alps' pending summary judgment motion as moot.

Alps' inequitable conduct claim involves OWW's conduct during the subsequent reexamination proceedings.  There, the Examiner responsible for reviewing the '237 patent also was responsible for a parallel reexamination proceeding involving a related patent that OWW owned, United States Patent No. 6,964,688 (the "'688 patent").  During the reexamination of the '688 patent, the Examiner rejected all challenged claims based on the Silosheath prior art.  That rejection applied equally against the related claims in the '237 patent.

The Examiner held an interview on July 16, 2007 with OWW, its counsel, and Bruce Kania (the named inventor of the '237 patent).  To overcome the rejections, OWW (through its attorney Eric Gayan) demonstrated to the Examiner how the Silosheath allowed gel to bleed through the nylon fabric.  OWW argued that the '688 and '237 patent s claimed gel liners that excluded any gel on the exterior of the fabric, thereby distinguishing them from the Silosheath. The Examiner allowed OWW to overcome the Silosheath prior art by amending the claims of the '688 and '237 patent s to clarify that the gel coating was only on the interior of the claimed products.

Shortly after the Examiner completed the first reexamination, Alps initiated a second ex-parte reexamination of the '237 patent.  This time, Alps attempted to focus the PTO's attention on the SSGL and, specifically, an advertisement dated January 1, 1995 in which Silipos purported to describe the SSGL:



(ECF No. 226, at 5 ("Comfort Zone Ad")).  Alps included the Comfort Zone Ad with its request.

The Examiner agreed with Alps that the Comfort Zone Ad invalidated the '237 patent. (ECF No. 111-1.)  In his written opinion, the Examiner noted that the Comfort Zone Ad showed a sock product with no visible amount of gel on the outer surface, and that "[o]ne having ordinary skill in the art would easily interpret the drawing to depict fabric as the outer layer and gel inside the sock."  (*Id*. at 5.)  The Examiner found that Mr. Comtesse's statements regarding Silipos' use of impermeable Coolmax fabric in manufacturing the SSGL prior to March 5, 1995 corroborated his (the Examiner's) interpretation of the Comfort Zone Ad.

OWW appealed the Examiner's decision to the Board of Patent Appeals and Interferences ("BPAI").  In advancing its position, OWW submitted to the BPAI multiple briefs, in which it argued that Mr. Comtesse's testimony is unreliable and should not have been used to corroborate the Comfort Zone Ad.  (ECF No. 164-6, at 12.)  Specifically, OWW argued that Mr. Comtesse was an interested party such that the weight afforded to his testimony should be limited.  OWW stated that Mr. Comtesse was an interested party for several reasons: (1) he was the inventor of the product at issue, (2) he "is the owner and manager of Vorum Research Corporation . . . a company that appears to sell products that compete with products offered by

Patent Owner," (*id*. at 15), and (3) he "admitted that he continues to receive royalties on Socket Gel Liner products he helped develop for Silipos." (*Id*. at 15.)  OWW concluded that, because Mr. Comtesse is an interested party, his testimony was insufficient to corroborate the Comfort Zone Ad on the issue of whether the SSGL was manufactured using impermeable fabric.  OWW noted that "Requester has provided no other evidence of any sort in this regard." (*Id*. at 18.)

OWW presented its arguments to the BPAI on July 20, 2011.  During oral argument, OWW (through its attorney) reiterated its argument that Mr. Comtesse's testimony was unreliable.  OWW asserted that the Comfort Zone Ad could not invalidate the '237 patent because "[t]here's no evidence that [the SSGL] existed.  I mean, the reality is that product is like a ghost at that time period." (ECF No. 114-2, at 42.)  OWW further asserted that "no one has been able to conclusively prove what the construction of a single socket gel liner was at the time period in question" and suggested that the "only actual evidence" corroborating the examiner's interpretation of the Comfort Zone Ad was the Comtesse testimony, which, for the same reasons as those asserted in OWW's brief, was unreliable.  (*Id*. at 44–45.)

The BPAI agreed with OWW.  On September 30, 2011, it issued an opinion describing the dispositive issue as whether the Examiner erred in "crediting the uncorroborated testimony of a third party in support of the rejections." (ECF No. 114-1.)  The BPAI stated that "[i]t is undisputed that Comtesse is an interested third party." (*Id*. at 10.)  The BPAI further stated that the statements in Comtesse's Declaration were "unaccompanied by . . . other acceptable evidence (e.g., testimony of a credible corroborating witness)" and that "we have not been directed to evidence sufficient to corroborate the Comtesse testimony indicating that the [SSGL from the Comfort Zone Ad] was covered in fabric with no gel bleed-through." (*Id*. at 11.)  The BPAI reversed the Examiner's decision and reinstated the '237 patent.

Following the conclusion of the second reexamination, this Court lifted the stay and reopened the present litigation. Alps immediately amended its counterclaim to detail OWW's alleged misrepresentations to the PTO during the reexamination proceedings.

Alps then filed a motion for summary judgment on OWW's infringement claims. (ECF No. 162.) OWW filed its own motion for summary judgment on its infringement claims (ECF No. 163) and then filed a second motion for summary judgment on Alps' inequitable conduct counterclaim (ECF No. 164).

In the briefing on Alps' inequitable conduct claim, the parties disputed whether OWW committed inequitable conduct in withholding information about the following pieces of evidence: the Uellendahl, Gailey, and McElhiney declarations, the Fay Liners, an abandoned Silipos patent application (dated June 5, 1993, and amended November 29, 1994) that described a fabric covering lined with gel for use by amputees, and letters from a Silipos attorney in 1999 setting forth Silipos' position that its products predate and invalidate the '237 patent . Alps also argued that OWW misrepresented portions of Mr. Comtesse's testimony to the BPAI.

In an Opinion and Order dated August 10, 2012, this Court granted Alps' motion for summary judgment and found that the disputed claims of the '237 patent were invalid. (ECF No. 209.) The Federal Circuit affirmed that ruling. (ECF No. 226.) This Court also granted OWW's motion for summary judgment on the inequitable conduct claim; however, the Federal Circuit reversed on that issue and remanded that claim for trial. (*Id*.) As explained in more detail below, the Federal Circuit concluded that the evidence could support a finding that OWW intentionally withheld and misrepresented material evidence during the reexamination proceedings.

This Court conducted a bench trial on July 30, 2014, July 31, 2014, and August 1, 2014 on Alps' inequitable conduct claim. The Court summarizes those proceedings below.

**B. Evidence Presented During Trial**

Alps called nine witnesses as part of its case in chief: Dr. Aldo Laghi, James Colvin (on cross examination), Bruce Kania (by designation of testimony from Case No. 8:08-cv-1893 in the Middle District of Florida), Robert Arbogast (on cross examination), Eric Gayan (on cross examination), Jeffrey Standley (on cross examination), Jean-Paul Comtesse (by deposition designation), John "Jack" Fay (by deposition designation), and Andrew McKelvey (by deposition designation). In addition to examining Alps' witnesses, OWW called Dr. Jerry Atwood, (by designation of testimony from Case No. 2:05-cv-1039 before another judicial officer in this District) and F. Michael Speed, Jr.

The witnesses offered the following testimony.

1. Dr. Aldo Laghi

Alps' President, Dr. Aldo Laghi, testified on behalf of Defendant. Dr. Laghi has been the president of Alps since 1988 and is the named inventor in over fifty patents.

Dr. Laghi testified that Alps is in the business of making and marketing prosthetic liners, sleeves, and components for general surgery. Alps introduced gel liners in approximately 1996. Having kept track of competitors' products at or around that time, Dr. Laghi knew that Silipos manufactured multiple types of gel liners in 1994, including the Silosheath and the SSGL. In fact, most of Silipos' products at or around that time (including the SSGL) had gel on only one side of the fabric. Dr. Laghi testified that he is familiar with both the SSGL and the Silosheath and that the distinguishing feature between the two is the fabric; the Silosheath is made with

8

nylon while the SSGL is made with Coolmax, which does not allow the gel to permeate the exterior surface of the fabric.

Dr. Laghi initiated both the first and second reexaminations of the '237 patent.  The first reexamination request was Dr. Laghi's first experience requesting reexamination.  In conjunction with that request, Dr. Laghi submitted approximately 1,300 pages of material to the PTO.  Dr. Laghi intended to submit all information to the PTO that would be material to the reexamination proceedings.

Dr. Laghi acknowledged that he did not submit a physical sample of the SSGL to the PTO.  He testified, however, that he did not know whether he would have been permitted to include physical samples with his request for reexamination.  Dr. Laghi did not bring a physical sample of the SSGL to trial and did not ask his counsel to bring one.

Dr. Laghi did not provide a declaration to the PTO from Robert Gould, the listed inventor on Silipos' abandoned 1993 patent application that purported covered the SSGL device.  Dr. Laghi stated that he tried to contact Mr. Gould but Mr. Gould did not want to get involved in this lawsuit.

Dr. Laghi acknowledged that, although he submitted a declaration from Jack Fay as part of his reexamination request, he did not ask Mr. Fay to discuss the Fay Liner.  Dr. Laghi similarly does not recall asking Mr. Comtesse to discuss the Comfort Zone Ad in the declaration he submitted to the PTO.

Dr. Laghi discussed the declarations from Messrs. Uellendahl, Gailey, and McElhiney that Alps submitted with its summary judgment motion a few weeks before it initiated the first reexamination request.  Dr. Laghi acknowledged that he elected not to submit those declarations to the PTO.  Instead, he elected to submit new declarations from Messrs. McElhiney and

Uellendahl in which the declarants opined that the advertisements in O&P Business News (including the Comfort Zone Ad) taught a sock-shaped covering that could utilize a non-permeable fabric that would prevent gel bleed through.  Dr. Laghi did not submit a declaration from Mr. Gailey with his reexamination request.

Dr. Laghi also acknowledged that there are differences between the declarations Mr. Gailey signed in 2006 (submitted to this Court in support of Alps' summary judgment motion filed September 22, 2006 (ECF No. 59)) and in 2011 (submitted to this Court in support of Alps' summary judgment motion filed April 13, 2012 (ECF No. 162)).  Specifically, the Gailey declaration Alps submitted in 2012 (ECF No. 194-1) cites a letter from a Silipos representative named Wendy Schlosser dated March 28, 1995 in which Ms. Schlosser purported to enclose a sample box of Silipos products.  Dr. Laghi testified that he has not seen anything to suggest that OWW knew of the Schlosser letter to Mr. Gailey before Alps filed it with the Court in 2012 (after the second reexamination had concluded).

In Dr. Laghi's own declaration that he submitted to the PTO, he did not mention the fact that the SSGL was constructed with Coolmax.  Dr. Laghi testified that he did not consider Coolmax to be a big deal at the time he submitted his reexamination request because it was well known that the SSGL was made from Coolmax, and because there were several fabric options available at that time that would be thick enough to prevent gel from bleeding through to the exterior of the fabric.

During the reexamination proceedings, Dr. Laghi kept abreast of OWW's arguments to the PTO because, as the requester, he received copies of the proceedings.  Dr. Laghi was not, however, permitted to submit additional information to the PTO.  In January 2008 (during the second reexamination proceeding), Dr. Laghi attempted to submit a letter to the Examiner in

order to focus the PTO's attention on certain testimony and evidence related to the SSGL.  The PTO refused to submit Dr. Laghi's letter to the Examiner.

Dr. Laghi acknowledged that, in November 2009, Alps (through its counsel) sent OWW's counsel a letter discussing the 1993 abandoned Silipos patent application that, in Alps' opinion, disclosed the SSGL and corroborated Mr. Comtesse's testimony.  After being shown a copy of an Information Disclosure Statement dated February 12, 2010, Dr. Laghi acknowledged that OWW had disclosed the abandoned Silipos 1993 patent application to the PTO.

Dr. Laghi attended OWW's oral argument before the BPAI in Washington, D.C. during the second reexamination proceeding.  When OWW argued that Mr. Comtesse was now a competitor of OWW who continued to receive royalties from Silipos, and denied the existence of other evidence supporting Mr. Comtesse's testimony, Dr. Laghi did not speak up because he was not permitted to do so.

Dr. Laghi testified about the multiple lawsuits between OWW and Alps involving the '237 and related patents.  According to Dr. Laghi, OWW has filed four lawsuits against Alps related to the '237 patent.  Alps has, in turn, filed two lawsuits against OWW for infringement of patents Alps licenses from Silipos.  One of those cases has been adjudicated in Alps' favor.

Dr. Laghi discussed the effect the multiple lawsuits have had on Alps.  Specifically, Alps has had to reallocate resources, cut down on research and development, hiring, and growth in order to pay the mounting legal fees.  Dr. Laghi testified that Alps has incurred approximately $3 million in this litigation alone.  Regarding research and development specifically, Dr. Laghi testified that Alps typically would allocate 10% of sales thereto but was unable to do so during the various litigation proceedings because it had to divert almost $10 million for legal fees.

Consequently, Alps put a freeze on new products it was developing, including certain medical devices and firearms.

        2.    <u>James Colvin</u>

Mr. Colvin, who currently serves as the Director of Research & Development for OWW, testified that he has been employed at OWW for the past twenty-five years.  Before being promoted to his current position (approximately two or three years ago), Mr. Colvin served as OWW's Director of Engineering.  In that capacity, Mr. Colvin was responsible for developing new products and managing the intellectual property associated with those products.  Mr. Colvin is the listed inventor on about twenty patents and considers himself to be knowledgeable about patent matters.

Mr. Colvin acknowledged that he was the ultimate decision maker with respect to some of OWW's intellectual property litigation matters, although Robert and Joe Arbogast (OWW's owners) occasionally made those decisions.  Mr. Colvin reported to Robert Arbogast until approximately 2005 or 2006, at which time he began reporting to OWW's General Manager.

Mr. Colvin's job responsibilities include overseeing patent prosecutions (including the '237 and related patents), overseeing this and related litigation, and overseeing the first and second reexamination proceedings discussed above.  Throughout his employment with OWW, Mr. Colvin has overseen the prosecution of approximately thirty patents as well as eight to ten reexamination proceedings.

At all times relevant to this litigation, Mr. Colvin was responsible for communicating with and being the primary contact for OWW's counsel, attending litigation events such as Markman hearings and some witness depositions, and attending certain events before the PTO.

Mr. Colvin acknowledged that no one at OWW has more knowledge of this lawsuit and/or the '237 patent reexamination proceedings than he does.

Mr. Colvin testified about the importance of the '237 patent to OWW's business.  Over the last ten years, one of OWW's biggest selling products has been the Alpha Original Liner ("Alpha Liner"), which is marked as being an embodiment of the '237 patent (among other patents).  Mr. Colvin acknowledged that the Alpha Liner and the '237 patent are important to OWW.

Regarding the first reexamination specifically, Mr. Colvin's responsibility was to oversee OWW's counsel (the Standley Law Group) and provide support as necessary.  During those proceedings, Mr. Colvin attended the 2007 interview on OWW's behalf.  Mr. Colvin testified that Bruce Kania, Eric Gayan (OWW's patent prosecution counsel from the Standley Law Group) and Jeff Standley (OWW's trial counsel from the Standley Law Group) also attended the interview.  Mr. Colvin, Mr. Gayan, and Mr. Standley met prior to the interview and flew to Washington, D.C. together.  Mr. Colvin understood the primary issue at the interview to be the difference between OWW's product and the Silosheath (and, specifically, the issue of whether the Silosheath allowed gel to bleed through to the exterior of the fabric).[1]  OWW's plan at the interview was to present a sample Silosheath to the Examiner to demonstrate the bleed-through issue and therefore distinguish the Silosheath from the '237 patent.  Mr. Colvin did not recall discussing whether to take a sample SSGL to the interview.

When questioned why OWW did not bring a sample SSGL to the interview, Mr. Colvin responded that OWW had obtained sample Silosheaths from the mid-1990's (i.e., prior to the critical date); however, OWW did not have a sample SSGL that conclusively represented the

---

[1] Mr. Colvin discussed the importance of the bleed-through issue.  He understood that a product with gel on the exterior surface could cause irritation to the prosthetic stump.

product as it existed before March 5, 1995.  Mr. Colvin testified that OWW had more recent product samples of the SSGL but was not aware whether those samples represented the product as it existed before March 5, 1995.  Mr. Colvin did not personally raise the issue of the SSGL with the Examiner during the interview.

Mr. Colvin testified that, during the 2007 interview, OWW represented that all Silosheaths it had inspected had gel on both sides of the fabric.  Mr. Colvin acknowledged that OWW was permitted to amend claim one of the '237 patent to distinguish it from prior art based on that representation.  He testified, however, that OWW did not intend to represent to the PTO that all Silosheath products allowed gel to bleed through to the exterior surface of the fabric.

Mr. Colvin was aware that, following the 2007 interview, OWW's attorney Eric Gayan participated in a telephone call with the Examiner in which he discussed other products but did not mention the SSGL.  Mr. Colvin does not recall advising Mr. Gayan to discuss the SSGL with the Examiner.  Mr. Colvin similarly does not recall instructing anyone to advise the Examiner that the SSGL (unlike the Silosheath) did not allow gel to bleed through to the exterior surface of the fabric, or that there were questions whether the SSGL allowed gel to bleed though.

Mr. Colvin was shown two letters from 1999 in which an attorney for Silipos, Michael Scalise, informed OWW of Silipos' position that it had been selling the Silosheath product line (including products containing gel on one only one side of the fabric) since 1992.  In the first letter, dated April 22, 1999 and directed to Robert Arbogast, Mr. Scalise attached an amendment to the abandoned 1993 patent application in which Silipos claimed a product with "a fabric outer layer; and an inner layer comprising a gel."  (Ex. D-22.)  That application lists Robert Gould— and not Jean Paul Comtesse—as the product's inventor.  In the second letter, which is dated

14

October 28, 1999 and directed to OWW's then-attorney Richard Treanor,[2] Mr. Scalise attached a sample Silosheath product liner that purportedly did not allow gel to bleed through to the exterior of the fabric, along with a shipping invoice dated November 1, 1993 listing the same product. (Ex. D-23.)

Mr. Colvin acknowledged that OWW had the letters in its possession at the time of the 2007 interview; however, he did not recall whether the letters were disclosed to the PTO at that time.  Mr. Colvin did not bring the letters to the Examiner's attention.  He similarly does not recall instructing OWW's attorneys to disclose the letters to the PTO or having any particular discussion on that subject.  Mr. Colvin testified that he did not know whether the letters should have been disclosed and that he left those decisions to OWW's attorneys.  Mr. Colvin also noted that, although the letters may not have been disclosed to the PTO, the attachments (i.e., the invoice and product sample) were disclosed.

When asked whether he believed OWW had an obligation to disclose the Scalise letters to the PTO, Mr. Colvin stated that he did not know.  Mr. Colvin indicated that, after everything OWW has gone through, if he had it to do over again he would err on the side of caution and disclose the letters to the PTO.

Mr. Colvin then testified about Jack Fay.  Mr. Colvin was familiar with Mr. Fay's claims that he invented a gel liner (with gel on only one side of the fabric) that predated the '237 patent's critical date.  In 2006, shortly after Mr. Fay's deposition in this litigation, Mr. Colvin flew to Florida with Robert Arbogast, and OWW's trial attorneys, Jeffrey Standley and Michael Speed.  Mr. Colvin stated that the purpose of the meeting was to talk settlement with Mr. Fay's

---

[2] Mr. Colvin testified that OWW transitioned its liner-related litigation from Mr. Treanor to the Standley Law Group about a year or two after receiving the second Scalise letter.

attorney (involving a related litigation between OWW and Thermo-Ply); he did not expect to see the Fay Liners.

During the meeting, Mr. Colvin viewed samples of the Fay Liners.  Mr. Colvin testified that it was impossible to tell when those samples were made, that the gel looked like silicone (as opposed to the copolymer gel material claimed by the '237 patent), and that at least one of the product samples inspected appeared to have gel visible on both the interior and exterior sides of the fabric.  Mr. Colvin stated that the product samples also presented chain of custody questions. Mr. Colvin indicated that OWW's attorneys had said there were documents supporting Mr. Fay's claims but that there were questions about those documents and what, if anything, they proved.

No one from OWW was permitted to take the product samples with them.  Mr. Colvin stated that Mr. Fay's attorney was protective of the samples.  Mr. Colvin did not, however, ask Mr. Fay for product samples to present to the PTO, nor did he instruct anyone else to make such a request.

Mr. Colvin testified that OWW did not tell the PTO about the Fay Liners during the 2007 interview.  When asked why, Mr. Colvin stated that OWW's lead trial attorney, Mr. Standley, had informed him that there was a "Chinese Wall" in place such that information gleaned from the litigation could not cross over into the patent prosecution side.[3]  Mr. Colvin also stated that one of the Fay Liners he inspected had gel on both sides of the fabric, that the product samples were undated and had been out of Mr. Fay's control for some time, and that the gel used in the Fay Liners looked like silicone.  Mr. Colvin testified that he and OWW's attorneys discussed whether the Fay Liners constituted prior art; however, he did not recall a conscious decision

---

[3] Mr. Colvin understood, however, that the rule applies to information designated as "Confidential" in the litigation. Mr. Colvin did not recall anyone telling him that he could not discuss the physical inspection of the Fay Liners.

being reached on that issue.  Mr. Colvin left the decision about whether to raise the issue of the Fay Liners with the PTO to OWW's attorneys.

Mr. Colvin also acknowledged that, prior to the 2007 interview, he was aware of the fact that Jean-Paul Comtesse had provided deposition testimony in this litigation.  Mr. Colvin stated that he only read small parts of that testimony.  He relied on OWW's patent prosecution counsel, Mr. Gayan, to read all relevant documents and inform OWW of the importance of those documents.

The next topic of Mr. Colvin's testimony was the second reexamination proceedings. Mr. Colvin indicated that he had substantial involvement in those proceedings.  He understood that the basis for the second reexamination was the Comfort Zone Ad, the Comtesse testimony, and the Comtesse declaration.

Mr. Colvin discussed the appeal brief that OWW (through its counsel) submitted to the BPAI.  Mr. Colvin provided information to Mr. Gayan for that brief.  Mr. Colvin left the issue of what to include in the appeal brief to Mr. Gayan's discretion.

Mr. Colvin was questioned about the three declarations from Alps' 2006 summary judgment motion (Uellendahl, Gailey and McElhiney) that OWW did not disclose to the PTO. Although Mr. Colvin was aware that Alps had filed a summary judgment motion in 2006, he was only told about the motion in general terms.  Mr. Colvin indicated that he had never signed the Protective Order in this litigation.  Because Alps' motion was filed under seal, someone at the Standley Law Group expressed concern over whether it could be shown to anyone who had not signed the Protective Order.  Mr. Colvin indicated that the Protective Order was a source of frustration for him during the litigation because he was told he could not review certain litigation materials.  He further testified that he had never been provided with documents marked

17

"Confidential" in the litigation and that he would not have expected documents filed under seal to have been provided to him.

Mr. Colvin stated that he was informed that, because of the Protective Order, he could not pass information back and forth between OWW's trial and prosecution counsel.  Mr. Colvin does not recall ever attending a meeting in which Messrs. Standley, Speed, and Gayan discussed the reexamination proceedings.  Rather, Mr. Colvin understood that Messrs. Standley and Speed would handle the litigation while Mr. Gayan handled the proceedings before the PTO.  The only time Mr. Colvin can recall the two sides mixing was when Mr. Standley attended the 2007 interview (along with Mr. Gayan) before the PTO.

At some point, Mr. Colvin learned of the Uellendahl, Gailey and McElhiney declarations.  Mr. Colvin testified that he has no reason to doubt the declarants' credibility.  He did not try to contact the declarants, nor did he disclose their involvement to the PTO.

In concluding his testimony, Mr. Colvin discussed the Standley Law Group.  Mr. Colvin understood that OWW hired Standley Law Group as its (OWW's) agents, and that the Standley Law Group had the authority to make representations on OWW's behalf.  Mr. Colvin acknowledged that OWW had a duty of candor to the PTO.  He believes OWW satisfied that duty by turning over all relevant information to its attorneys.  Mr. Colvin stated that he relied on Mr. Gayan's experience to make decisions regarding disclosure to the PTO.

3.    Bruce Kania (via deposition testimony)

Mr. Kania, who is a below-knee amputee, is the listed inventor of the '237 patent.  Mr. Kania sought to create the product now claimed in the '237 patent when, in August 1992, he wore a Silipos Silosheath that tore and caused a lesion to develop on his skin.  Mr. Kania attempted to contact Silipos and discover the materials used in the product but Silipos did not tell

him what they were.  At that time, Mr. Kania began to explore creating a different product that would not cause the same issues as the Silosheath.  Once Mr. Kania developed a commercially advanced prototype, he contacted several companies and eventually began working with OWW.

Mr. Kania and OWW engaged in a joint development effort in which they built a range of prototypes.  Mr. Kania stated that they created several failed products before eventually creating the Alpha Liner.  After successfully obtaining the '237 patent, Mr. Kania transferred his rights thereunder to OWW, which ultimately paid Mr. Kania millions of dollars (approximately $5 million to $8 million) in royalties.

Mr. Kania testified that he never intended to copy the Silosheath product.  Rather, he sought to create a product that rectified the issues he personally experienced with the Silosheath.

4.  Robert Arbogast

Mr. Arbogast and his brother each are 50% owners of OWW.  Mr. Arbogast has been employed by OWW for the past fifty-two years.  Until two years ago, Mr. Arbogast served as OWW's President.  He is listed as a co-inventor on approximately twenty patents (all for products in the field of prosthetics) and understands that patent holders have a duty of candor to the PTO.  Mr. Arbogast considers himself an expert in prosthetics.

Mr. Arbogast testified briefly about OWW's history.  His grandfather founded OWW in 1907.  OWW currently employs about 185 people.  It sells its products to distributors, practitioners, prosthetists, and patients.  OWW outfits military personnel and indigent people with prosthetic devices for free.

Mr. Arbogast testified that he delegated full authority to James Colvin to handle OWW's intellectual property matters.  According to Mr. Arbogast, it was Mr. Colvin's responsibility to understand competitors' products and make decisions regarding OWW's intellectual property.

Mr. Colvin worked independently and only reported to Mr. Arbogast if a report was necessary. The two would meet approximately once every four months.

Mr. Arbogast acknowledged that intellectual property is very important to OWW. Mr. Arbogast stated that Mr. Colvin is competent and trusted to handle the company's intellectual property matters.

Regarding competitors' products, Mr. Arbogast testified that he occasionally attended trade shows, where many of OWW's competitors set up booths displaying their products. Some OWW employees would walk around to inspect those products. OWW occasionally would order competitors' products to see what the competition was doing. If a competitor's product had qualities that OWW deemed advantageous, OWW would incorporate those qualities into its own products as long as it could do so without violating any intellectual property rights. It was Mr. Colvin's responsibility to make sure OWW did not infringe its competitors' intellectual property rights.

When questioned about recent litigation OWW has faced, Mr. Arbogast testified that, in a 2009 lawsuit, OWW was found to have willfully infringed a competitor's patent. OWW also recently settled a case with another one of its competitors.

Mr. Arbogast then discussed the '237 patent specifically. Mr. Arbogast acknowledged that the Alpha Liner is a commercial embodiment of claim one of the '237 patent. He acknowledged that, over the last ten years, the Alpha Liner has been OWW's best-selling product.

Mr. Arbogast discussed OWW's profits related to the '237 patent. OWW sells its Alpha Liners for approximately $140. Mr. Arbogast did not know OWW's exact profit margin on that product but testified that OWW likely made about $60 net profit per liner. OWW's gross

revenue over the last ten years is about $290 million, with more than 70% of that revenue coming from the sale of gel liners such as the Alpha Liner.  Mr. Arbogast indicated that OWW has paid more than $10 million in royalties to Mr. Kania.

Mr. Arbogast was then shown a Silipos Silosheath.  Mr. Arbogast acknowledged that the only difference between the Silosheath and the product claimed by the '237 and '688 patents (which, Mr. Arbogast testified, are very similar) is the fact that the Silosheath allows gel to bleed through to the exterior of the fabric.

Mr. Arbogast testified about the work that went into developing the '237 patent.  OWW worked closely with Bruce Kania during that time and spent hundreds of thousands of dollars on product development.  Mr. Arbogast testified that Bruce Kania examined a number of different Silosheath products while developing the subject matter of the '237 patent.  For OWW's part, Mr. Arbogast was certain that Mr. Colvin would have thoroughly investigated competitors' products that were available during that time.

Mr. Arbogast testified about the differences between a sheath and a liner.  A sheath is made from a thin nylon fabric that allows gel to bleed through onto the exterior surface of the fabric and is almost always worn with a sock or some other interface.  A liner, on the other hand, is one piece that is constructed using a thicker, form fitting, stand-alone interface.

Mr. Arbogast was shown a memo from OWW's largest distributor, SPS, to OWW's then-marketing director, Jeff Martin.  In the memo, dated December 9, 1994, SPS indicated that it was sending various Silosheath products to OWW.  OWW did not have gel liners on the market at that time.  Mr. Arbogast indicated that OWW would have obtained the specified products from SPS in order to examine its competitor's (Silipos') product and determine whether OWW could manufacture something similar.

21

Attached to the memo is a list, purportedly prepared by Mr. Kania, of various Silipos products that Mr. Kania believed were competitive with the product he was in the process of developing with OWW.  Several of the listed products were marked "Patent Pending."  Mr. Abrogast acknowledged that the list indicates that Silipos had more than one product in its Silosheath product line in the year 1994.  Importantly, Mr. Kania's list included the product "BK Soft Socket Gel Liner" but Mr. Arbogast did not know what that product was.  Mr. Arbogast acknowledged that the document indicates that Mr. Kania and OWW (specifically, Mr. Colvin) were aware of the listed Silipos products during the 1994 time frame.

Mr. Arbogast testified that the Silipos products sent to OWW from SPS used a variety of different materials.  When asked if he thought it would be obvious to dip different types of stump socks (using different fabrics) into gel, Mr. Arbogast answered, "yes."

Mr. Arbogast then discussed the present litigation.  He likely authorized the litigation against Alps based on Mr. Colvin's advice.  Mr. Arbogast stated that it was Mr. Colvin's responsibility to manage OWW's counsel during the litigation and that he (Mr. Arbogast) had little contact with the Standley Law Group.  He disclaimed any knowledge of the substance of Alps' 2006 summary judgment motion or its attachments.

Mr. Arbogast indicated that he never signed the Protective Order in this case and had not seen it before testifying.  He acknowledged that Alps' 2006 summary judgment motion was marked "Filed Under Seal Pursuant to Agreed Protective Order."  When shown copies of specific attachments, however, Mr. Arbogast acknowledged that some of the deposition testimony was marked "Confidential" but that none of the declarations (including the Uellendahl, Gailey, and McElhiney declarations) were marked "Confidential" or "For Attorney's Eyes Only."  Mr. Arbogast could not identify any reason that the unmarked attachments such as the

Uellendahl, Gailey, and McElhiney declarations could not have been disclosed to the PTO.  Mr. Arbogast also testified that he thought the PTO was a "qualified person" as the Protective Order defines the term and that, based on that definition, he believed information marked "Confidential" under the Protective Order could have been provided to the PTO.

Mr. Arbogast disclaimed any knowledge of the substance of Jean-Paul Comtesse's deposition testimony.  Mr. Arbogast was unsure whether he read the Comtesse testimony but, other than knowing that Mr. Comtesse was a principal of Silipos at some point, he had no personal knowledge of Mr. Comtesse's claims regarding the SSGL.  Mr. Arbogast acknowledged that Mr. Comtesse's current company, Vorum Research Corporation, competes with OWW in the market of prosthetics-related scanning technology (but not in the gel liner market).

Regarding the first reexamination of the '237 patent, Mr. Arbogast testified that he delegated full responsibility to Mr. Colvin.  Mr. Arbogast never instructed Mr. Colvin to misrepresent or withhold evidence from the PTO.   Mr. Arbogast did not attend and had no involvement with the July 2007 interview before the PTO.

Mr. Arbogast attended the meeting in 2006 with Jack Fay's counsel.  Mr. Arbogast stated that the purpose of the visit was to discuss the cases between OWW and Thermo-Ply.  Mr. Arbogast personally inspected Mr. Fay's product samples and discussed those product samples with OWW's counsel.  Mr. Arbogast had questions as to whether Mr. Fay's product samples used the same materials as those disclosed by the '237 patent.

During the meeting, Mr. Arbogast asked Mr. Fay's counsel for a physical sample of the product.  Mr. Fay's counsel denied the request.  Mr. Arbogast did not ask Mr. Fay or his attorney to submit a sample of the product to the PTO.  When questioned whether it would be important

to tell the PTO about a competitor's claim (such as Mr. Fay's), Mr. Arbogast stated that he did not know.

Regarding the second reexamination of the '237 patent, Mr. Arbogast stated that he had no knowledge of that matter. Mr. Arbogast delegated all responsibility for that proceeding to Mr. Colvin. Mr. Arbogast was not certain of the outcome of that proceeding but felt certain Mr. Colvin had advised him of the same.

Mr. Arbogast then discussed the letters OWW received in 1999 from Mr. Scalise. Mr. Arbogast stated that, when he received the first Scalise letter (which was addressed to him), standard operating procedure would have been to give the letter to Mr. Colvin. Mr. Arbogast stated that Mr. Scalise's letters did not convince him, as one of ordinary skill in the art, that Silipos' abandoned 1993 patent application disclosed prior art that predated and invalidated the '237 patent. When asked why, Mr. Arbogast repeatedly stated that he would not believe a product such as that disclosed in the abandoned 1993 application existed until he saw it firsthand. Mr. Arbogast did, however, acknowledge that a product with gel on both sides of the fabric (such as the Silipos Silosheath) would not satisfy the abandoned 1993 patent application's claims.

In discussing the second letter from Mr. Scalise, Mr. Arbogast acknowledged that the letter explained Silipos' position that its product pre-dated the '237 patent. Mr. Arbogast does not know if the product Mr. Scalise enclosed with the letter exists or where it is today. Mr. Arbogast had no evidence that OWW did not receive the product with the letter.

Mr. Arbogast then discussed the following Silipos advertisement in O&P Business News dated September 1, 1994:



(Ex. D-32 ("1994 Ad").)  Mr. Arbogast was familiar with O&P Business News at that time.  Mr.

Arbogast would not admit that, despite the inset graphic showing multiple levels labeled "skin,"

"polymer gel," "fabric," and "dermatologist tested," the 1994 Ad teaches a product with gel on

only one side of the fabric.  Mr. Arbogast stated that a product such as that depicted in the 1994

Ad could still allow gel to bleed through to the exterior surface of the fabric.  Mr. Arbogast also

noted that the graphic does not identify the type of fabric used and that, if the fabric was nylon

(such as that used in the Silosheath), the gel would indeed bleed through to the exterior surface.

As a final matter, Mr. Arbogast testified that he suffered a brain tumor six years ago and

has trouble remembering things (although he has not been diagnosed with memory loss).  He

could not, for example, remember what materials he reviewed the night before his testimony.

    5.   <u>Eric Gayan</u>

Mr. Gayan is a partner with Standley Law Group.  He has approximately sixteen years of

patent prosecution experience, which typically includes preparing patent applications, licenses,

and technology agreements, among other things.  Mr. Gayan did not handle the initial

prosecution of the '237 patent; however, he represented OWW in the first and second reexamination proceedings discussed above.

Mr. Gayan generally does not get involved in patent litigation.  Regarding this litigation specifically, Mr. Gayan played any early role therein (he believes he conducted some research for a brief) and had a general familiarity with the case but was not made aware of new developments as they occurred.  Mr. Gayan testified that he signed the Protective Order in 2005 in connection with the aforementioned research project.

Mr. Gayan explained that the Standley Law Group instituted a wall between its representation of OWW in this litigation (the "litigation side") and in the reexamination proceedings before the PTO (the "prosecution side").  Standley Law Group attorneys Jeffrey Standley and F. Michael Speed represented the litigation side, while Mr. Gayan represented the prosecution side.  The wall was erected because opposing counsel was concerned about OWW's patent counsel seeing certain documents from OWW's competitors.

As an example of the prosecution/litigation wall, Mr. Gayan testified about a deposition in 2005 that he attended with one of OWW's litigation attorneys.  Mr. Gayan stated that he attended the deposition in a support capacity because the Standley Law Group has a small number of attorneys.  Because the parties designated portions of the deposition as "trial counsel's eyes only," Mr. Gayan was asked to leave the room several times.  In the deposition, Alps' counsel asked for confirmation that Mr. Gayan would not see the information marked "trial counsel's eyes only."

Mr. Gayan testified that everyone from Standley Law Group understood the procedure with respect to his and OWW's duty of candor to the PTO.  Mr. Gayan was confident that someone from the litigation side would have provided him with any non-confidential, relevant

information from the litigation that he would have needed to satisfy that duty.  Mr. Gayan would have relied on someone from the litigation side to provide him with that information; he would not have affirmatively asked for it.  Mr. Gayan testified that he would not have asked to see anything filed under seal in this litigation.

Mr. Gayan was not sure whether he was made aware of Alps' 2006 summary judgment motion at the time it was filed.  He did not ask anyone at the Standley Law Group if there was any non-confidential information in that motion that was relevant to the reexamination proceedings.  Mr. Gayan testified that he was not aware of the Uellendahl, Gailey, and McElhiney declarations until after the Federal Circuit released its 2013 Opinion.

Mr. Gayan testified that he believes he lived up to his obligations under the Protective Order.  He testified that both he and OWW's litigation attorneys were careful to maintain the prosecution/litigation wall.

When Mr. Gayan first received the assignment to represent OWW in the first reexamination of the '237 and related patents, the first thing he did was read portions of the request for reexamination.  At the time of the July 2007 interview with the PTO, Mr. Gayan had not read the full Comtesse testimony because the PTO had not referenced it; he would not have read extra material that the PTO did not consider relevant.  Mr. Gayan testified that the attorney's role in a reexamination proceeding is limited to responding to the rejection issued by the PTO.

Mr. Gayan attended the July 2007 interview before the PTO on OWW's behalf.  He confirmed that Mr. Standley, Mr. Colvin, and Mr. Kania also attended the interview.  Mr. Gayan testified that Mr. Standley did not coach him during the interview or share his (Mr. Standley's) thoughts about the interview.  Mr. Gayan and Mr. Standley did not discuss the 2007 interview

with each other.  Rather, the sole purpose of Mr. Standley's attendance was client comfort (OWW was a relatively new client of the Standley Law Group and Mr. Standley was its primary point of contact).

At the 2007 interview, Mr. Gayan took a sample Silipos Silosheath to discuss with the Examiner.  His purpose in doing so was to demonstrate the distinction between the Silosheath and OWW's product.  Mr. Gayan explained that the interview lasted approximately forty to forty-five minutes, during which time Mr. Kania explained the product and the PTO was shown a demonstration of the way in which the Silosheath allowed gel to bleed through to the exterior of the fabric.  Mr. Gayan did not remember discussing any other gel liners (such as the SSGL) with the PTO at that time.

Importantly, Mr. Gayan testified that OWW represented to the PTO that it did not know of any other products in existence before March 5, 1995 that did not allow gel to bleed through to the exterior surface of the fabric.  Neither Mr. Gayan nor anyone in attendance at the interview represented that all Silosheath products ever made have gel bleed through.

Mr. Gayan testified that he offered to make deposition transcripts from this litigation available to the PTO but that the Examiner declined the offer.[4]  Mr. Gayan did not discuss Mr. Comtesse during the 2007 interview.

Mr. Gayan was questioned about whether his duty of candor to the PTO extended to evidence that was "not airtight."  Mr. Gayan testified that it was a hard question but that he typically would err on the side of caution and disclose the information.

---

[4] Mr. Gayan stated that he knew the PTO conducted litigation searches but that he did not know what information the PTO could access (i.e., whether it could access information filed under seal).  Mr. Gayan believed that the PTO did not accept his offer to make deposition testimony available because it had the ability to get that information themselves.

Mr. Gayan was then questioned about Jack Fay's claim that the Fay Liner predated the '237 patent's critical date.  Mr. Gayan stated that he does not think he knew about the Fay Liners during the first reexamination.  When asked if he thought Mr. Fay's claim should have been disclosed to the PTO, Mr. Gayan stated that there was no basis to find that Mr. Fay's claim was credible and that any documents supporting Mr. Fay's claim were confidential.  Mr. Gayan testified that, if he had a sample Fay Liner, he would have sent it to the PTO.  Mr. Gayan has never read Mr. Fay's deposition.

Mr. Gayan was questioned about the Scalise letters.  Mr. Gayan stated that he did not remember seeing either letter.  He was not sure whether they were attached as exhibits to Alps' summary judgment motion.  Mr. Gayan stated that he had heard from Mr. Colvin that an attorney had contacted OWW on Silipos' behalf but that he (Mr. Gayan) thought those communications were related to litigation defenses—i.e., Silipos' position that it did not infringe OWW's patents. Mr. Gayan does not remember being aware of Mr. Scalise's claim that Silipos manufactured a product that predated and invalidated the '237 patent.  Mr. Gayan stated that the Scalise letters were not relevant to the reexamination proceedings because they did not relate to a prior patent or publication.  He acknowledged, however, that if he had the Scalise letters in his possession at the time of the reexamination proceedings, he would have disclosed them to the PTO.

Regarding the second Scalise letter specifically, Mr. Gayan testified that he has never seen the actual product sample that Mr. Scalise enclosed therewith.  Mr. Gayan stated that Mr. Treanor (OWW's then-attorney to whom the second Scalise letter was addressed) submitted that product sample to the PTO.  Mr. Gayan assumes the product sample is still with the PTO.

Mr. Gayan testified that, during the first reexamination proceeding, he filed an Information Disclosure Statement with the PTO in which he attached photographs of the product

29

sample and copies of the invoices Mr. Scalise had attached with his letter, among other things. Once Mr. Gayan provided this information to the PTO, he did not mention it again. Mr. Gayan confirmed that he never submitted the Scalise letters themselves to the PTO; he reiterated that he had not seen the Scalise letters at that time. Mr. Gayan stated that he intended to provide everything in his possession to the PTO.

Mr. Gayan confirmed that, after the July 2007 interview, the PTO called him and said OWW could amend its patents to clarify that its invention only claimed gel on one side of the fabric, thereby distinguishing OWW's patents from the Silipos Silosheath. He acknowledged that the amendment claiming gel on only one side of the fabric was the "reason for patentability."

Mr. Gayan also confirmed that he represented OWW in the second reexamination proceeding. Mr. Gayan stated that he generally would have reviewed the second reexamination request when he received it. Mr. Gayan stated that the issue in the second reexamination proceeding was the SSGL and whether it was made using Coolmax fabric. Mr. Gayan confirmed that the Comfort Zone Ad was included within Dr. Laghi's second reexamination request, as was the complete transcript of Mr. Comtesse's deposition. Mr. Gayan believes that a declaration from Mr. Comtesse was included with the second reexamination request but not the first.

Mr. Gayan confirmed that, after receiving the Examiner's rejection of claims 1–23 of the '237 patent, OWW appealed the decision. Mr. Gayan testified that OWW's position during the appeal was that the Comfort Zone Ad was deficient because it does not teach the use of Coolmax fabric in order to prevent gel bleed through. In other words, the issue on appeal was what the Comfort Zone Ad says and then, secondarily, whether the Examiner properly relied on Mr. Comtesse's testimony as corroboration.

During the appeal process, Mr. Gayan represented to the BPAI that Mr. Comtesse invented the SSGL such that he was an interested party.  Despite the Federal Circuit's comments in its 2013 Opinion, Mr. Gayan stands by that position.  He testified that, in his mind, Mr. Comtesse's testimony establishes that he invented the SSGL because he had the relevant knowledge (the product's listed inventor, Mr. Gould, had no experience with gel liner technology), it was his development, and he received a royalty from the sale of the product, among other reasons.  Mr. Gayan testified that he believes the name on the patent application does not matter and that an attorney must look at what each individual did and not what he calls himself.  Mr. Gayan does not think that, based on the totality of the evidence, there is even an argument that Mr. Comtesse did not invent the SSGL.  Mr. Gayan also stated that he believes the BPAI came to its own conclusion that Mr. Comtesse invented the SSGL and that the Federal Circuit did not read all of Mr. Comtesse's testimony when it suggested he was not the inventor.  Finally, Mr. Gayan noted that he cited to portions of Mr. Comtesse's testimony in making each of his arguments and that he was not trying to mislead the PTO.

Mr. Gayan addressed the Federal Circuit's suggestion that he misrepresented Mr. Comtesse's level of interest to the PTO by asserting that Mr. Comtesse's company (Vorum Research Corporation) was a competitor of OWW.  Mr. Gayan testified that he still believes that assertion to be true.  He testified that Vorum Research Corporation makes Cadcam software that competes with OWW's Omega system.  According to Mr. Gayan, he never intended to suggest that Vorum Research Corporation competes with OWW in the gel liner market.

Mr. Gayan also addressed the Federal Circuit's suggestion that he misrepresented Mr. Comtesse's level of interest to the PTO by arguing that Mr. Comtesse was still receiving

royalties from Silipos at the time of the reexamination proceedings.  Mr. Gayan acknowledged that he made a mistake on this point.

Mr. Gayan testified that he believed Mr. Comtesse was an interested party, which heightened the need for corroboration of his testimony.  Mr. Gayan believes, however, that the testimony would have needed corroboration regardless of whether Mr. Comtesse was an interested party or not.

When questioned whether he should have informed the BPAI about the Uellendahl, Gailey, and McElhiney declarations, Mr. Gayan stated that he had no idea those declarations existed until he read the Federal Circuit's 2013 Opinion.  He noted that any declarations filed with Alps' 2012 summary judgment motion could not have been submitted to the PTO because the reexamination process was closed by that point.  When asked about his duty of candor to the PTO and whether he had a duty to investigate something he did not know about, Mr. Gayan stated that he does not know how he would have discovered that information.  He testified that he disclosed what he knew and believes he satisfied his duty of candor to the PTO.

6.    Jeffrey Standley

Mr. Standley is the managing partner of the Standley Law Group, which has approximately six partners and twelve or thirteen attorneys in total.  The Standley Law Group's practice is specific to intellectual property law.  Mr. Standley testified that all attorneys employed by the Standley Law Group are registered patent attorneys who are authorized to practice before the PTO.  Mr. Standley himself has twenty-five years of experience practicing patent law.  Approximately 10% of his practice involves patent prosecution (although he generally only participates in an advisory capacity).

Mr. Standley is OWW's trial counsel in this litigation.  He testified that Mr. Gayan participated in the litigation in 2004; however, once OWW became comfortable with Mr. Gayan as its patent prosecution counsel, Mr. Gayan did not play a role in the litigation.  Mr. Standley testified that Mr. Gayan devotes a majority of his practice to patent prosecution.

Mr. Standley testified about his understanding of the Protective Order in this case.  He acknowledged that paragraph 26 of the Protective Order requires any filing with confidential information contained therein to be filed in a sealed envelope, such that not all materials filed under seal necessarily are confidential.  Mr. Standley testified that, despite that interpretation of the Protective Order, it was his belief that anything filed under seal is being designated as confidential such that the parties were not permitted to use that material for anything other than the litigation.

Mr. Standley testified that, although he read the Uellendahl, Gailey, and McElhiney declarations when they were filed, and although the documents themselves are not marked as confidential, he did not convey the information contained therein to Mr. Gayan or the PTO.  When asked why, Mr. Standley stated that he had to erect a wall between the prosecution side and litigation side in order to avoid violating the Protective Order.  Because Mr. Gayan was not involved in the litigation, and because Alps' 2006 summary judgment motion was filed under seal, Mr. Standley did not believe he could share the substance of Alps' motion or accompanying exhibits with Mr. Gayan.

Mr. Standley also testified that he did not believe the Uellendahl, Gailey, or McElhiney declarations were relevant to Mr. Gayan's role as patent prosecution counsel.  He stated that declarations are for a courtroom, where the witness can be cross-examined, and are not part of reexamination law.  He also emphasized that the declarations in this case were carefully worded

and that Mr. Uellendahl, Mr. Gailey, and Mr. McElhiney did not clearly state that they saw an SSGL before March 5, 1995 that had gel on only one side of the fabric.  Mr. Standley offered the following additional observations that call into question whether the SSGL existed before March 5, 1995: (1) Jean-Paul Comtesse testified that the SSGL was the same product as another product called the Dermaseal, which allowed gel to bleed through to the fabric's exterior, (2) the Comfort Zone Ad states that the SSGL was part of the "Silosheath product line," all of which (to OWW's knowledge) used nylon that allowed gel to bleed through to the exterior of the fabric, (3) all products Mr. Kania collected before developing the '237 patent  allowed gel to bleed through to the fabric's exterior, (4) an SSGL materialized in 1997 that was advertised as using Coolmax fabric, thereby suggesting that the SSGL advertised in the Comfort Zone Ad did not use Coolmax, and (5) Mr. Comtesse testified that Silipos bought a robot at the end of 1995 in order to address a gel-bleed-through problem.  Mr. Standley also testified that, although there were about five different SSGLs introduced in this case, he still has never seen one from before the critical date with gel on only one side of the fabric.  He agrees with Mr. Gayan's characterization of the pre-critical date SSGL as a "ghost" product.

Mr. Standley was questioned whether he should have disclosed the evidence in question in order to let the PTO draw its own conclusions.  In response, Mr. Standley stated that he did not believe the Uellendahl, Gailey, or McElhiney declarations corroborated anything in the reexamination proceedings.  He stated that a patent owner's duty of candor in reexamination proceedings must be interpreted in light of other regulations, especially 35 U.S.C. § 302.  He also stated that the Uellendahl, Gailey, and McElhiney declarations were specifically crafted to supply a missing link that did not exist in the Comfort Zone Ad, and that Alps likely did not send those declarations to the PTO in connection with its reexamination requests because it knew they

were outside the scope of reexamination proceedings.  Mr. Standley's understanding of the patent rules is that declarations are only permitted in reexamination proceedings in order to clarify minutia such as the date of a particular advertisement.  Mr. Standley testified that anything other than that "would cause chaos."

Mr. Standley then testified about the Fay Liner.  Mr. Standley acknowledged Mr. Fay's claim that he produced a liner before March 5, 1995 that did not allow gel to bleed through.  Mr. Standley also acknowledged that a sample Fay Liner and medical records that Mr. Fay claimed supported his claim were produced during Mr. Fay's deposition.  Finally, Mr. Standley acknowledged that he physically inspected a sample Fay Liner during a meeting with Mr. Fay's counsel in Florida.  Mr. Standley did not disclose any evidence related to the Fay Liner with the PTO because he did not think such evidence belonged in a reexamination proceeding.  Mr. Standley noted several flaws with Mr. Fay's claim, including but not limited to the facts that Mr. Fay referred to his product as a "liner" but stated that he provided patients with additional socks (which they would not need if the product was truly a liner), that the product samples Mr. Fay made available to OWW and its counsel were not marked with a date, and that several chain of custody issues existed, among other things.  Mr. Standley stated that he did not believe the sample Fay Liners were constructed using the same gel claimed by the '237 patent and that one of the sample products showed evidence of gel bleed through.  Regarding the documents Mr. Fay claimed supported his assertions, Mr. Standley stated that he saw invoices showing materials that Mr. Fay purchased, but no evidence as to what Mr. Fay used in the Fay Liners.

Mr. Standley was questioned about the Scalise letters.  Mr. Standley saw the letters in 2004 or 2005.  He did not disclose them to Mr. Gayan at that time.  Mr. Standley acknowledged that the letters were not marked as confidential and that they could have been presented to Mr.

Gayan without violating the Protective Order; however, Mr. Standley stated that he would not have presented those letters or the abandoned 1993 patent application to the PTO because the application was abandoned and unpublished and therefore did not constitute prior art.  Mr. Standley did not recall discussing with Mr. Colvin whether to disclose the 1993 application to the PTO.

Next, Mr. Standley was questioned about the 2007 interview before the PTO.  When questioned why he attended the interview given the wall between the prosecution side and litigation side, Mr. Standley stated that he was not planning to attend the interview but did so because he thought Mr. Colvin wanted him to attend.  Mr. Standley stated that the purpose of the wall was to prevent confidential information from being passed from one side to the other; he does not believe his attendance at the interview contravened the purpose of the wall.

Mr. Standley testified that he did not counsel Mr. Gayan as to what he should present during the interview.  Mr. Standley did not ask for Mr. Gayan's notes or provide thoughts for the interview summary Mr. Gayan prepared.  Mr. Standley stated that he did not participate in the interview other than physically attending.

Mr. Standley also testified that he did not say anything to the PTO during the interview. He did not mention the Uellendahl, Gailey, or McElhiney declarations, Scalise letters, or Comtesse testimony.  When asked why, Mr. Standley stated that the PTO was interested in talking about the Silosheath.  Mr. Standley also noted that Mr. Gayan introduced him as OWW's litigation counsel at the end of the interview and stated that there existed testimonial evidence that OWW could provide to the PTO.  The PTO declined the offer.  Mr. Standley stated that he did not think it was relevant to the reexamination proceedings to explain what the testimony was.

Regarding the second reexamination request, Mr. Standley stated that he was aware of the same but was not involved.  He did not get reports from Mr. Gayan as to how the proceedings were progressing.  He did not attend the BPAI hearing.  Mr. Standley stated that he trusts Mr. Gayan and did not feel the need to get involved.

Mr. Standley discussed receiving a letter in 2009 from Alps' counsel.  In the letter, Alps' counsel referenced the abandoned 1993 Silipos patent application.  Mr. Standley does not know whether he gave the abandoned application to Mr. Gayan at that time (he does not recall doing so).

To summarize his testimony, Mr. Standley stated that he did not provide the Uellendahl, Gailey, or McElhiney declarations to Mr. Gayan because they were filed under seal such that Mr. Standley believed he was prohibited from disclosing them.  Mr. Standley also did not believe there was any new evidence contained within those declarations or that the declarations were proper in a reexamination proceeding.  Mr. Standley similarly did not provide the Fay Liners to Mr. Gayan because he was never allowed to possess them and because the diary entries accompanying the Fay Liners were filed under seal.  Mr. Standley believes he lived up to his obligations under the Protective Order.  On re-cross examination, Mr. Standley acknowledged that he never asked Alps if any of the aforementioned evidence could be released from the Protective Order.

      7.    <u>Jean-Paul Comtesse (via deposition designation)</u>

Alps designated certain portions of Mr. Comtesse's testimony as part of its case in chief. OWW objected to those designations on the ground that "[t]he entire Comtesse Deposition was before the Patent and Trademark Office as part of the file wrapper for the first reexamination of the '237 patent  which was also reviewed by the examiner in the second reexamination of the

'237 patent ."  (ECF No. 262, at 3.)  In the alternative to its objection, OWW designated the entirety of Mr. Comtesse's deposition.

Having considered OWW's objection, the Court **OVERRULES** the same and will consider Mr. Comtesse's testimony.

In his deposition, Mr. Comtesse testified about his experience with Silipos.  Mr. Comtesse testified that, in the early 1990's, he was the person to decide what kind of products and what kind of developments Silipos would undertake.  Mr. Comtesse testified that he was personally and directly involved in developing and manufacturing prosthetic products for Silipos until 1999, at which time the company was sold to a third party.  Mr. Comtesse did not have any relationship with Silipos at the time of his deposition in 2006.

According to Mr. Comtesse, Silipos started developing the Silosheath in 1990.  That product was introduced into the market at the end of 1992 or 1993.  Mr. Comtesse testified that Silipos continually expanded the Silosheath product line to add similar products that were constructed using different materials.

Mr. Comtesse also testified about Silipos' Single Socket Gel Liner.  According to Mr. Comtesse, the Single Socket Gel Liner was constructed using Coolmax fabric that did not allow gel to visibly penetrate the opposing surface of the fabric.  Mr. Comtesse testified that Silipos distributed the Single Socket Gel Liner before March of 1995.

During his deposition, Mr. Comtesse was shown a sample product marked Exhibit 29B.  Mr. Comtesse identified the product as a Single Socket Gel Liner (manufactured using Coolmax) that was produced in 1993 or 1994.  He could identify the year based on the color of the gel and the label on the product.

8.     Andrew McKelvey (via deposition designation)

As part of its case in chief, Alps designated portions of Mr. McKelvey's August 3, 2005 deposition in this litigation.  Mr. McKelvey testified as Silipos' Rule 30(b)(6) witness.

OWW objected to the use of Mr. McKelvey's testimony on the ground that it was marked "Trial Counsels' Eyes Only" under the Protective Order.  (ECF No. 58-9, at 1.)  OWW argues that neither OWW nor Mr. Gayan can be responsible for misleading the PTO about information that they were barred from reviewing in the first place.  OWW concludes that Mr. McKelvey's testimony is irrelevant to the issue currently before the Court.

The Court agrees.  Even without the "Trial Counsels' Eyes Only" designation, the content of Mr. McKelvey's testimony is only tangentially relevant to the issues before this Court.  Alps does not dispute that Mr. McKelvey's testimony was designated (in its entirety) as trial counsel only and that Mr. Gayan attended the deposition but, because of the designation, was asked to step out of the room multiple times and eventually asked to leave.  Because neither Mr. Gayan nor anyone at OWW can be charged with knowing the contents of Mr. McKelvey's deposition, the contents are not relevant to the present issue.  The Court therefore **SUSTAINS** OWW's objection to Mr. McKelvey's testimony.

9.     John ("Jack") Fay (via deposition designation)

Alps also designated portions of Mr. Fay's July 6, 2006 deposition.  OWW objects to those designations on the ground that Mr. Fay's testimony is irrelevant to the issues before this Court.  OWW argues that neither Mr. Fay's testimony nor the Fay Liners are admissible in a reexamination proceeding before the PTO because they do not constitute prior art or printed publications.  OWW objects to Mr. Fay's testimony on the additional ground that Mr. Fay's deposition was designated "Confidential, Attorney's Eyes Only" under the Protective Order such

that "OWW employees were not permitted to review the testimony and lack any knowledge of Mr. Fay's testimony." (ECF No. 262, at 4.) OWW adds that "Mr. Gayan was not in attendance at Mr. Fay's deposition and was likewise not permitted to review Mr. Fay's testimony." (*Id*. at 5.)

The Court again agrees with OWW. Alps does not dispute that the parties agreed to designate Mr. Fay's deposition testimony as "Attorney's Eyes Only" pursuant to the Protective Order. As such, neither Mr. Gayan nor anyone at OWW can be charged with knowing the contents of Mr. Fay's deposition. Given that fact and the limited relevance of Mr. Fay's testimony, the Court **SUSTAINS** OWW's objection to Mr. Fay's deposition testimony.

After calling Dr. Laghi and Messrs. Colvin, Kania, Arbogast, Gayan, Standley, Comtesse, McKelvey, and Fay, Alps rested on its counterclaim.

10. Dr. Jerry Atwood

OWW then called Dr. Atwood as a witness in their case in chief. In lieu of having Dr. Atwood appear at trial, OWW designated portions of his testimony from a preliminary injunction proceeding in Case No. 2:05-cv-01039, *Ohio Willow Wood Co. v. Alps South, LLC* (Apr. 30, 2009).

OWW offers Dr. Atwood's testimony to rebut the following exchange that occurred during Robert Arbogast's testimony:

> Q.     Do you recall Dr. Atwood testifying in front of Judge Sargus relative to the Fay liner?
> A.     Yes.
> Q.     Do you recall Dr. Atwood testifying that at least one of the Fay liner in his opinion had gel on only one side of the fabric?
> A.     No, I don't recall that. He's also a professional witness employed by Alps.

40

(ECF No. 275, at 2.)  Alps objected to that testimony on the ground that OWW did not disclose Dr. Atwood as a witness; however, based on the foregoing exchange, the Court **OVERRULES** the objection and will consider Dr. Atwood's testimony.

In the portion of his testimony designated by OWW, Dr. Atwood was shown a Fay Liner and testified that it allowed gel to impregnate the material and penetrate through to the exterior surface of the fabric.  In the portion of his testimony designated by Alps, Dr. Atwood testified that the gel used in the Fay Liner was the same as the gel used in the Alps liners and the Silipos liner.  Dr. Atwood also testified that the liner he was shown would be capable of creating an air-tight seal and that, where cracks occur, it is because the liner has been pressed and stored in a way that caused it to lose some integrity along the seams.

11.    F. Michael Speed, Jr.

OWW called Mr. Speed on direct examination.  Mr. Speed has been an attorney since 1996 and with the Standley Law Group since 2002.  He has been a partner with the Standley Law Group since 2007.  In that capacity, he performs all aspects of civil litigation.  Mr. Speed was the primary associate representing OWW in this litigation.

Mr. Speed was questioned about the Protective Order in this case.  He stated that the parties engaged in discussions regarding the Protective Order early in the proceedings.  The parties negotiated the terms of the Protective Order before signing it.

Mr. Speed testified about the deposition of Silipos' 30(b)(6) witness Andrew McKelvey, portions of which were designated as "Trial Counsel Only" under the Protective Order.  Mr. Speed testified that Mr. Gayan attended the deposition but, because of the designation, he could not see many of the documents used and repeatedly had to step out of the room.  Mr. Speed

testified that he lived up to his representations to opposing counsel during that deposition that Mr. Gayan would not see the material designated as "Trial Counsel Only."

Mr. Speed then testified about the 2006 deposition of Jack Fay. Because the parties designated that deposition as "Trial Counsel Only," Mr. Speed testified that he couldn't disclose the contents thereof with Mr. Gayan or with OWW. Mr. Speed testified that both he and Mr. Colvin were frustrated that OWW could not see certain information because of the Protective Order in the litigation.

Mr. Speed testified that Alps' 2006 summary judgment motion was delivered to the Standley Law Group in a bound version. Mr. Speed understood that the document and its attachments were filed under seal pursuant to the Protective Order. He did not go through the bound document and remove certain documents therefrom (although he acknowledged that it could have been unbound and copied fairly easily). Mr. Speed testified that, shortly after Alps filed its summary judgment motion, the case was stayed and the file was put away. It did not occur to Mr. Speed to go through the file while the case was stayed. Mr. Speed confirmed that he did not share any exhibits from Alps' 2006 summary judgment motion with Mr. Gayan at any time.

Mr. Speed was questioned whether, for documents filed under seal, he had to make determinations as to what information was confidential within that document. Mr. Speed answered that, although that should be the practice, in this case all documents filed under seal were treated as if they were confidential. Mr. Speed acknowledged that, in 2006, the Court did not have electronic filing and the parties could not file redacted documents. As such, parties filing documents that contained confidential information had to place the whole document in a sealed envelope. Mr. Speed testified that, if a party placed a document in a manila envelope and

42

filed that document under seal, then everything contained within the manila envelope was sealed. Mr. Speed stated that the party could then file public information separately.

Regarding the wall in general, Mr. Speed testified that it was his idea to keep files separate between the litigation side and the prosecution side. Each side did not discuss its respective role with the other. Mr. Speed stated that he never disclosed confidential information to Mr. Gayan and felt the wall was maintained. Mr. Speed did not attend the 2007 interview with the PTO or the BPAI hearing in 2011.

Mr. Speed echoed Mr. Standley's testimony that the purpose of the wall was to prevent confidential documents from crossing over between the sides. Although Mr. Speed acknowledged that discussions not designated as confidential could be shared, he stated that he still would not share discussions about the litigation with Mr. Gayan. In Mr. Speed's words, he did not "cross-pollinate."

Next, Mr. Speed testified about the deposition of Jean-Paul Comtesse. Mr. Speed acknowledged that Mr. Comtesse testified about a physical sample of a Silipos liner marked as Exhibit 29B, but stated that he (Mr. Speed) has not seen the exhibit since the deposition. Mr. Speed stated that the parties' agreement was that the party who brought the exhibit to the deposition would keep it. Mr. Speed further stated that Alps' counsel took Exhibit 29B with him after the deposition and, presumably, still has it.

Mr. Speed then discussed the Gailey declaration from 2006. Mr. Gailey stated in his declaration that he was providing a sample product therewith; however, Mr. Speed has never seen that product in person. Mr. Speed testified that OWW did not depose Mr. Gailey after he submitted his declaration but before the case was stayed.

43

Mr. Speed explained that Mr. Gailey submitted a different declaration in May 2012 in which he stated that he received in SSGL in late March 1995 (the product was enclosed with a letter from Silipos representative Wendy Schlosser dated March 28, 1995).  Mr. Speed testified that there was no explanation given for why there was a German tag on that product and that several chain of custody issues exist.  Mr. Speed has never seen the physical sample that Ms. Schlosser purportedly provided to Mr. Gailey.

Mr. Speed testified that the issue of whether the SSGL existed pre-March 5, 1995 was a contested issue in this litigation.  Mr. Speed noted that no one has ever held one up and said, "here's one."  Mr. Speed further noted that Mr. McElhiney and Mr. Uellendahl were being compensated by Alps such that their testimony lacked credibility, and that the first Silipos publication advertising Coolmax fabric occurred after the critical date.  Mr. Speed concluded that the Comfort Zone Ad did not convince him that an SSGL using Coolmax fabric existed prior to March 5, 1995.

Mr. Speed then testified about the meeting in July 2006 with Mr. Fay's counsel.  Mr. Speed stated that the purpose of the meeting was to determine when and from what material the Fay Liners were made.  Mr. Speed noted that there were no markings that would indicate a date on the sample products he examined.  Mr. Speed further stated that the records that Mr. Fay said supported his claim were marked "Trial Counsel Only."  Finally, Mr. Speed confirmed that someone from OWW asked if they could take a sample product with them; Mr. Fay's attorney denied the request.  Mr. Speed was not convinced that the sample Fay Liners he examined had been manufactured before the critical date, although he was aware that Mr. Fay (and Alps) took the opposite position.

Mr. Speed discussed the 2009 letter from Alps' counsel to the Standley Law Group.  Mr. Speed does not recall if he discussed that letter with OWW.  Mr. Speed stated that the Standley Law Group did discuss the letter internally and that his initial reaction was that Alps' arguments in the letter were the same arguments Alps had made throughout this litigation.  Mr. Speed did not recall taking any action in response to the letter.

Mr. Speed also discussed a letter dated July 2, 2012 in which it was suggested that the Standley Law Group was not being candid with the PTO.  Mr. Speed said he took the letter seriously and that the Standley Law Group would have discussed it internally.

Mr. Speed then discussed the 1999 letters from Michael Scalise.  He did not recall whether he thought to inform Mr. Gayan about those letters.  When asked if he thought the letters were important to Mr. Gayan's role as prosecution counsel, Mr. Speed stated that he did not know what Mr. Gayan knew.  Mr. Speed did not recall discussing with OWW whether to turn the Scalise letters over to the PTO during the reexamination proceedings.

During cross examination, Mr. Speed was questioned whether he was familiar with the patent bar rule that information would be imputed to others at the same law firm—in other words, if Mr. Gayan had received documents relevant to the litigation, would Mr. Speed be obligated to produce them?  Mr. Speed stated that, if a subpoena had been received, he would have asked Mr. Gayan whether he had documents responsive to the subpoena.

## II.    ANALYSIS

### A.  Patent Rules

Before addressing its findings of fact and conclusions of law, the Court notes that the following rules apply to patent holders and their attorneys in their dealings with the PTO.  These rules applied to OWW and its counsel at all times relevant.

Individuals who file and prosecute a patent application with the PTO have "a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability."  37 C.F.R. § 1.56(a). "[That] definition of materiality . . . is intended to provide the Office with the information it needs to make a proper and independent determination on patentability.  It is the patent examiner who should make the determination after considering all the facts involved in the particular case."  Manual of Patent Examining Procedure ("MPEP") § 2001.04.

The duty of candor applies to each inventor named in the application, each attorney or agent who prepares or prosecutes the application, and "[e]very other person who is substantively involved in the preparation or prosecution of the application and who is associated with the inventor, the applicant, an assignee, or anyone to whom there is an obligation to assign the application."  37 C.F.R. § 1.56(c)(1)–(2).  "Individuals other than the attorney, agent or inventor may comply with this section by disclosing information to the attorney, agent, or inventor."  *Id*. § 1.56(d).

The scope of reexamination proceedings is more limited than the initial filing and prosecution process.  In reexamination proceedings, claims are examined "on the basis of patents or printed publications."  *Id*. § 1.552(a).  Rejections in a reexamination proceeding "will <u>not</u> be based on matters other than patents or printed publications, such as public use or sale."  MPEP § 2258(B).

As a result, the duty of candor to the PTO during reexamination proceedings is more limited than the duty during the initial filing and prosecution process.  That is, "[e]ach individual associated with the patent owner in a reexamination proceeding has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information

known to that individual to be *material to patentability in a reexamination proceeding*." 37 C.F.R. § 1.555(a) (emphasis added).  Information is "material to patentability in a reexamination proceeding when it is not cumulative to information of record or being made of record in the reexamination proceeding," and:

> (1) It is a patent or printed publication that establishes, by itself or in combination with other patents or printed publications, a prima facie case of unpatentability of a claim; or
>
> (2) It refutes, or is inconsistent with, a position the patent owner takes in:
>
>> (i) Opposing an argument of unpatentability relied on by the Office, or
>>
>> (ii) Asserting an argument of patentability.

*Id*. § 1.555(b).

Additional guidelines from the Code of Federal Regulations and MPEP are relevant to the duty of disclosure.  For example, MPEP § 2001.06 provides that "individuals may be or become aware of material information from various sources such as, for example, co-workers, trade shows, communications from or with competitors, potential infringers, or other third parties, related foreign applications."  The rules also explicitly reference information from related litigation: "Another example of such material information is any assertion that is made during litigation which is contradictory to assertions made to the examiner."  MPEP § 2001.06(c) (citing *Environ Prods., Inc. v. Total Containment, Inc*., 43 USPQ2d 1288, 1291 (E.D. Pa. 1997)).  "Such information might arise during litigation in, for example, pleadings, admissions, discovery including interrogatories, depositions, and other documents and testimony."  *Id*.

The rules also provide specific guidelines regarding protective orders.  Under MPEP § 724.01:

> It is incumbent upon patent applicants . . . to bring 'material' information to the attention of the Office.  It matters not whether the "material" information can be

classified as a trade secret, or as proprietary material, or whether it is subject to a protective order. The obligation is the same; it must be disclosed if "material to patentability" as defined in 37 CFR 1.56(b). The same duty rests upon a patent owner under 37 CFR 1.555 whose patent is undergoing reexamination.

The rule goes on to provide methods for submitting confidential material to the PTO in order to preserve the proprietary nature of that information.  *See* MPEP § 724.02.

## B.  Inequitable Conduct Standard

The Federal Circuit set forth the legal standard for claims of inequitable conduct in its November 15, 2013 Opinion and Order:

> Inequitable conduct is an equitable defense to patent infringement. *Therasense, Inc. v. Becton, Dickinson and Co.*, 649 F.3d 1276, 1285 (Fed. Cir. 2011). It is only applied where the patentee has unfairly obtained an unwarranted patent through misconduct. *Id.* at 1292.  Thus, "[t]o prove inequitable conduct, the challenger must show by clear and convincing evidence that the patent applicant (1) misrepresented or omitted information material to patentability, and (2) did so with specific intent to mislead or deceive the PTO." *In re Rosuvastatin Calcium Patent Litig.*, 703 F.3d 511, 519 (Fed. Cir. 2012) (citing *Therasense*, 649 F.3d at 1287).

*Ohio Willow Wood Co. v. Alps South, LLC*, No. 2012-1642, 2013-1024, at 16 (6th Cir. Nov. 15, 2013) (hereinafter "*Willow Wood*").

The Federal Circuit made the following observations about the materiality prong of an inequitable conduct claim:

> Typically, an allegation of inequitable conduct before the PTO requires proof that the patentee withheld or misrepresented information that, in the absence of the withholding or misrepresentation, would have prevented a patent claim from issuing. *Therasense*, 649 F.3d at 1291. Because the analysis of this *but-for* materiality requirement is from the perspective of the PTO, we apply the preponderance of the evidence standard in assessing whether the withheld or misrepresented information would have blocked patentability. *Id.* at 1291-92.
>
> A party alleging inequitable conduct, however, need not strictly demonstrate but-for materiality in all cases.  Rather, "[w]here the patentee has engaged in affirmative acts of egregious misconduct, such as the filing of an unmistakably false affidavit," materiality is presumed.  *Id.* at 1292 (citations omitted). *See also Outside the Box Innovations, LLC v. Travel Caddy, Inc.*, 695

F.3d 1285, 1294 (Fed. Cir. 2012) ("a false affidavit or declaration is per se material"). In this context, materiality is premised on the notion that "a patentee is unlikely to go to great lengths to deceive the PTO with a falsehood unless it believes that falsehood will affect issuance of the patent." *Id.*

*Willow Wood*, at 17–18.

Regarding intent, the Federal Circuit stated:

The specific intent to commit inequitable conduct may be inferred from indirect and circumstantial evidence. [*Therasense*, 649 F.3d at 1290.] But, deceptive intent must be "the single most reasonable inference drawn from the evidence." *Id.* at 1290 (quoting *Star Scientific Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1366 (Fed. Cir. 2008)). The inference cannot be based on gross negligence and "when there are multiple reasonable inferences that may be drawn, intent to deceive cannot be found." *Id.* at 1290-91 (citing *Scanner Techs. Corp. v. ICOS Vision Sys. Corp.*, 528 F.3d 1365, 1376 (Fed. Cir. 2008)). Additionally, because the burden of proof is on the party alleging inequitable conduct, the patentee need not offer a good faith explanation for its alleged misconduct unless a threshold level of deceptive intent has been demonstrated. *Id.* at 1291.

*Willow Wood*, at 29.

## C. Law-of-the-Case Doctrine

Before addressing its findings of fact from the July 2014 trial, the Court notes that the Federal Circuit implicitly resolved several legal issues in its November 15, 2013 Opinion and Order that moot some of arguments raised in the pre- and post-trial briefing. This Court is bound by those legal conclusions unless one of three "exceptional circumstances" exist: "the evidence on a subsequent trial was substantially different, controlling authority has since made a contrary decision of the law applicable to such issues, or the decision was clearly erroneous and would work a manifest injustice." *Smith Int'l, Inc. v. Hughes Tool Co.*, 759 F.2d 1572, 1576 (Fed. Cir. 1985) (discussing the law-of-the-case doctrine and quoting *Cent. Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1580–81 (Fed. Cir. 1983)).

OWW suggested in pre-trial briefing that the Federal Circuit's general remand on the issue of inequitable conduct negates application of the law-of-the-case doctrine; however, that

argument is unavailing.  The law-of-the-case doctrine "is a restriction self-imposed on the courts to further the interests of judicial efficiency, and is based on the policy that issues once decided should remain so." *Chapman v. Nat'l Aeronautics & Space Admin*., 736 F.2d 238, 241 (5th Cir. 1984).  As such, even if OWW were correct and this Court technically is not bound by the Federal Circuit's conclusions regarding inequitable conduct, those conclusions are of maximum persuasive value such that the Court should follow them unless one of the three exceptional circumstances set forth above exist.  *Cf. DeLong v. Equip. Co. v. Wash. Mills Electro Minerals Corp*., 990 F.2d 1186, 1197 (11th Cir. 1993) (finding that the law-of-the-case doctrine applied to the appellate court's conclusions at the summary judgment stage even though the appellate court was not making factual findings at that time).  The Court therefore begins its analysis by identifying the Federal Circuit's conclusions regarding materiality and intent.

   1. <u>Materiality</u>

  In its November 15, 2013 Opinion and Order, the Federal Circuit stated that the "crux" of the materiality determination "hinges on whether OWW withheld or misrepresented information that, in the absence of the withholding or misrepresentation, would have led the BPAI to credit Mr. Comtesse's testimony that the pre-critical date SSGL was constructed using a Coolmax fabric." *Willow Wood*, at 19.  This statement makes clear that the focus of the Court's inquiry is on what would have happened absent the withholding or misrepresentation.  The focus is not on OWW's legal arguments as to whether the PTO should have considered Mr. Comtesse's testimony in the first place.

  The Federal Circuit went on to conclude that a reasonable fact-finder could find that OWW withheld material information from the PTO by not disclosing (1) the Uellendahl, Gailey, and McElhiney declarations from Alps' 2006 summary judgment motion, (2) Silipos' abandoned

1993 patent application, and (3) the physical product sample of the SSGL that Mr. Comtesse

reviewed during his deposition (Exhibit 29B).[5]  Regarding the latter piece of evidence, the

Federal Circuit noted that the physical product sample rebutted Mr. Gayan's argument to the

BPAI that "there were no known examples of SSGL products from the relevant time period"

such that the product was essentially a "ghost."  *Id*. at 22.  The Federal Circuit concluded:

"Overall, the testimony from the three prosthetists, the patent application, and the physical

exhibits provide consistent and convincing evidence that corroborates Mr. Comtesse's testimony

regarding the structure of the SSGL prior to March 5, 1995.  It is the cumulative weight of this

evidence that lends credibility to Mr. Comtesse's testimony."  *Id*. at 25.

      In making these findings, the Federal Circuit implicitly rejected OWW's legal argument

that the allegedly withheld information is outside the scope of reexamination proceedings

because it does not constitute prior art or printed publications.  To the contrary, the Federal

Circuit's Opinion and Order suggests that the information is "material to patentability in a

reexamination proceeding" because it refutes or is inconsistent with OWW's position in

opposing an argument of unpatentability relied on by the PTO.  *See* 37 C.F.R. § 1.555(b)(1);

*Willow Wood*, at 21–23.  Consequently, if the Court makes the factual finding that OWW did, in

fact, withhold the three referenced pieces of evidence from the PTO, then it is guided by the

Federal Circuit's conclusion that such an omission was "material to patentability" such that the

first element of Alps' inequitable conduct claim is satisfied (unless one of the three exceptions to

the law-of-the-case doctrine applies).  *See Smith Int'l., Inc.*, 759 F.2d at 1576.

      The Federal Circuit also concluded that the evidence could support a finding that OWW's

patent prosecution counsel, Eric Gayan, "misrepresented Mr. Comtesse to the BPAI."  *Willow*

*Wood*, at 25.  Specifically, the Federal Circuit found that the following statements by Mr. Gayan

---

[5]The Federal Circuit did not address Alps' arguments regarding the Silosheath and/or the Fay Liners.

constitute misrepresentations: (1) that Mr. Comtesse was still receiving royalty payments from Silipos at the time of his deposition in 2006, when in fact Mr. Comtesse testified that his relationship with Silipos ended in 1999 and that he had no personal stake in the outcome of this litigation, and (2) that Mr. Comtesse was the inventor of the SSGL. The Federal Circuit stated that, viewing those misrepresentations in the light most favorable to Alps, those misrepresentations are tantamount to the filing of an unmistakably false affidavit such that materiality is presumed. *Willow Wood*, at 18 (citing *Therasense*, 649 F.3d at 1292).

Several legal conclusions are implicit in those findings. In stating that Mr. Gayan misrepresented Mr. Comtesse to the PTO, the Federal Circuit implicitly rejected OWW's legal argument that Mr. Gayan's comments were mere "attorney argument" that cannot form the basis of a finding of inequitable conduct. It also implicitly rejected OWW's legal argument that Mr. Gayan's statements cannot be but-for material because Mr. Comtesse's testimony required corroboration regardless of his status as a prior inventor or interested party. Finally, the Federal Circuit implicitly rejected OWW's legal argument that Mr. Gayan could not have misrepresented Mr. Comtesse's testimony because the BPAI had the entire deposition transcript in front of it. As a result, if this Court finds that Mr. Gayan did, in fact, make the statements to the BPAI that the Federal Circuit considered, then it is guided by the Federal Circuit's reasoning that such statements are tantamount to the filing of an unmistakably false affidavit such that materiality is presumed (unless one of the three exceptions to the law-of-the-case doctrine applies). *See Smith Int'l, Inc.*, 759 F.2d at 1576.

2. Intent

The Federal Circuit found that the evidence in this case could support a finding that "OWW withheld various pieces of material information and had no reasonable explanation for

the several misrepresentations it made to the PTO." *Willow Wood*, at 30.  The Federal Circuit

stated:  "We leave it to the district court to determine if the inference of deceptive intent that we

hold could be drawn when viewing the evidence in a light most favorable to Alps remains after

assessing the credibility of OWW's witnesses." *Id*.

　　　In making these statements, the Federal Circuit implicitly rejected OWW's legal

argument that, "[a]s to the purposed misstatements . . . there is no evidence of intent to deceive

as the evidence shows the PTO had the entire transcript and Mr. Gayan cited to page and line

references in his brief."  (ECF No. 276, at 36.)  The Federal Circuit also implicitly rejected

OWW's arguments that Mr. Gayan's misrepresentations "were either true or fair attorney

argument based upon a reasonable interpretation of the deposition transcript."  (*Id*.)

Consequently, the question for the Court with respect to intent is whether OWW's witnesses

have credible explanations for the omissions and misrepresentations such that deceptive intent is

not the single most reasonable inference to be drawn.  *See Willow Wood*, at 30.

　　　With that background in mind, the Court makes the following findings of fact and

conclusions of law.

### D.  Findings of Fact and Conclusions of Law

　　　Prior to 1994, Bruce Kania used a Silopos Silosheath product.  The product allowed gel

to bleed through to the exterior surface of the fabric, which caused irritation.  Mr. Kania set out

to create a product that would resolve the issue of gel bleed through.  Mr. Kania worked with

OWW to develop that product.

　　　Both Mr. Kania and OWW were aware, prior to March 5, 1995, that Silipos

manufactured different products in its Silosheath line.  Mr. Kania and OWW were aware of a

Silipos product numbered 1215 ("1215 Product") that potentially was competitive with the

product they sought to develop.  OWW received a sample of the 1215 Product from one of

Silipos' distributors.  The evidence did not show that the 1215 Product was the SSGL that

eventually was depicted in the Comfort Zone Ad or that the 1215 Product was constructed using

Coolmax.

On January 1, 1995, Silipos ran the Comfort Zone Ad in O&P Business Magazine.  The

Ad depicts a "Single Socket Gel Liner" as part of Silipos' Silosheath product line.  The Comfort

Zone Ad does not mention Coolmax or the 1215 Product.

Subsequent to that date, OWW sought to patent the product it developed with Mr. Kania.

The critical date for that patent (the '237 patent) is March 5, 1995.

In late March 1995, Silipos representative Wendy Schlosser sent a letter to prosthetist

Robert S. Gailey enclosing a sample SSGL.  The Federal Circuit referenced this letter in its

November 15, 2013 Opinion and Order; however, there is no evidence that OWW had

knowledge of this letter before Alps filed it with this Court in 2012.  This letter therefore is not

relevant to the issue of inequitable conduct.

The '237 patent became effective on March 5, 1996.  OWW eventually obtained several

related patents, including the '688 patent.

OWW's Alpha Liner product is a commercial embodiment of the '237 and '688 patents.

The Alpha Liner became OWW's best-selling product and has generated several millions of

dollars in revenue for OWW.

In April 1999, an attorney for Silipos named Michael Scalise sent a letter to OWW.  The

letter sets forth Silipos' position that it manufactured and sold products in the Silosheath product

line that did not allow gel to bleed through to the exterior of the fabric since 1992.  Mr. Scalise

also enclosed a copy of an amendment to a patent application dated June 15, 1993, now

abandoned, directed at a protective garment with a fabric outer layer and an inner layer comprising a gel.

Mr. Scalise sent another letter to OWW a few months later.  This letter was addressed to OWW's then-counsel, Richard Treanor.  In this letter, Mr. Scalise stated that the 1215 Product contains gelatinous material "coated on only one side thereof" as set forth in the '237 patent.  Mr. Scalise also enclosed a sample of the 1215 Product and a shipping invoice dated November 1, 1993 indicating that Silipos was selling the 1215 Product as of that date.

Mr. Treanor sent the sample 1215 Product and invoice received from Mr. Scalise to the PTO.  It is unknown whether the PTO still has the sample.  Mr. Treanor also submitted a Statement of Relevancy, received by the PTO on November 8, 2000, in which he stated that Silipos provided the product sample and invoice to OWW and attached pictures of the sample 1215 Product.  The Scalise letters themselves were not disclosed.

The Scalise letters prove that, in 1999, OWW knew that Silipos claimed to have manufactured a product that predated and therefore would invalidate its '237 patent.  OWW also knew that Silipos had applied for, but abandoned, an amendment to a prior patent application that would have covered that product.  The Scalise letters do not prove that the 1215 Product was the SSGL or that the 1215 Product did not allow gel bleed through.

OWW instituted this lawsuit against Alps on December 27, 2004 for infringement of the '237 patent.  It also instituted lawsuits against at least one other competitor, Thermo-Ply, which sold similar products.  OWW did not institute litigation against Silipos.  At all times relevant, OWW was represented (in litigation) by the Standley Law Group and, specifically, by trial attorneys Jeffrey Standley and F. Michael Speed, Jr.

On July 26, 2005, the Court entered a Protective Order in this litigation.  The Protective Order defines confidential information as, *inter alia*, trade secrets or other proprietary or confidential research, development, or commercial information.  The Protective Order also allows the parties to designate material as "Confidential" or "Confidential – For Trial Counsel Only" by marking "each page" of the document as such or by indicating on the record that certain deposition testimony is confidential.  (ECF No. 18 ¶¶ 5–6.)  Material that contains confidential information "shall be filed and kept by the Court in sealed envelopes or other appropriately sealed containers."  (*Id*. ¶ 26.)  The Court interprets these provisions to mean that material filed under seal is not necessarily confidential under the Protective Order.  Rather, for documents other than deposition testimony, the inquiry turns on whether each page of material filed under seal has been so marked.

The parties to this litigation engaged in discovery throughout 2005 and 2006.  On August 3, 2005, Mr. Speed deposed Silipos 30(b)(6) representative Andrew McKelvey.  Eric Gayan attended the deposition along with Mr. Speed; however, the attorneys designated the testimony "Confidential – Trial Counsels' Eyes Only" and Mr. Gayan was asked to leave.  Mr. Gayan was not permitted to participate in the deposition because he was not OWW's "trial counsel."

In July 2006, Mr. Speed deposed non-party Jack Fay.  Mr. Fay claimed to have manufactured and sold a product (the Fay Liner) that predated and invalidated the '237 patent. The attorneys designated the entirety of Mr. Fay's deposition as "Confidential, Attorney's Eyes Only" under the Protective Order.

Shortly after Mr. Fay's deposition, Messrs. Colvin, Arbogast, Speed and Standley flew to Tampa, Florida to meet with Mr. Fay's attorney.  While there, they examined two samples of the Fay Liners.  Everyone understood that Mr. Fay claimed the Fay Liners predated and invalidated

the '237 patent.  The consensus after the meeting was that there existed some questions about whether the Fay Liners constituted prior art.

On August 14, 2006, Mr. Speed deposed former Silipos executive Jean-Paul Comtesse. Mr. Comtesse testified, among other things, that Silipos manufactured and sold the SSGL before March 5, 1995 and that the SSGL was manufactured using Coolmax, which did not allow gel to bleed through to the exterior of the fabric.  Mr. Comtesse's testimony was not designated as "Confidential" or "Confidential – For Trial Counsel Only."

Alps filed a motion for summary judgment on September 22, 2006.  (ECF Nos. 59–61.) The motion and its exhibits were filed under seal.  The front pages of the motion and Appendix were labeled "Filed Under Seal Pursuant to Agreed Protective Order."  (*Id.*)

Alps attached excerpts from the Comtesse deposition, the McKelvey deposition, and the Fay deposition to its motion.  Alps also attached declarations from Jack E. Uellendahl, Robert S. Gailey, Jr., and James McElhiney ("Summary Judgment Declarations"), as well as photographs purporting to depict a sample pre-critical date SSGL ("Summary Judgment Photographs").

None of the Comtesse deposition excerpts, Summary Judgment Declarations, or Summary Judgment Photographs were marked "Confidential" or "Confidential – Trial Counsel Only" pursuant to the Protective Order.  The Court therefore finds that the Protective Order does not cover or prevent disclosure of those documents.

In his declaration, prosthetist Jack Uellendahl stated that there "existed, and were used prior to March 1995, products with a gel-like material which featured mineral oil as a key ingredient that were supported on one side with a fabric."  (ECF No. 60-14, at 3.)  Mr. Uellendahl continued: "Silipos also offered a product by January 1, 1995 . . . that product was a Silipos Single Socket Gel Liner . . . There was no gel on the exterior of the liner, and there was

no bleed through with the Single Socket Gel Liner as there was with respect to some of the Silosheaths because the fabric on the Single Socket Gel Liner was thicker or more dense than the covering on the Silosheath."  (*Id.* at 4.)

Professor Robert S. Gailey stated in his declaration that "Silipos has been making and selling the Single Socket Gel Liner since at least January 1, 1995 . . . I have never seen any evidence of gel on the exterior surface of a Single Socket Gel Liner; *i.e.*, there is no bleed-through of the gel." (ECF No. 60-15, at 2.)  Mr. Gailey eventually signed another declaration stating that he received a sample of the SSGL from Silipos representative Wendy Schlosser in late March 1995; however, as stated above, there is no evidence that OWW was aware of that fact until after the reexamination proceedings had concluded.

Prosthetist James McElhiney stated in his declaration that he "fitted more than one patient with the Silipos Single Socket Gel Liners, and certainly prior to March 5, 1995. . . . The [SSGL] had a substantially thicker or more dense fabric covering than the Silosheath.  As a result, when Silipos coated the interior of the covering of the [SSGL], the gel did not bleed or pass through the covering to the exterior."  (ECF No. 60-17, at 3.)

The Court finds that OWW had knowledge of the content of the Comtesse deposition, the Summary Judgment Declarations, and the Summary Judgment Photographs at or around the time Alps submitted its motion.  Mr. Colvin testified that he was barred from reviewing the motion and its exhibits because he never signed the Protective Order and his counsel advised him that the material was confidential.  That testimony, however, is not credible.  It is inconceivable that the OWW representative responsible for litigation involving the '237 patent—the commercial embodiment of which, as stated above, was OWW's best-selling product—would not review the portions of Alps' summary judgment motion and exhibits not designated as "attorney's eyes

only" simply because he chose not to sign the Protective Order.  It is even more inconceivable

that he would not review the exhibits that had no confidential designation without following up

with Alps or the Court about whether the material was intended to be designated as confidential.

The Court therefore finds that, at or around September 22, 2006, OWW knew that at least three

individuals with no readily-ascertainable connection to Mr. Comtesse had corroborated his

testimony that Silipos manufactured and sold a version of the SSGL that did not allow gel bleed-

through prior to March 5, 1995.

Alps filed its first request for ex parte reexamination on October 5, 2006.  In connection

with its request, Alps submitted the entire Comtesse deposition to the PTO.  It also submitted

declarations from Messrs. Uellendahl and McElhiney that are different from the ones it

submitted with its summary judgment motion.  The Uellendahl and McElhiney declarations Alps

submitted with its reexamination request focus on the teachings from various Silipos publications

(including the Comfort Zone Ad) and do not reference the SSGL.

Alps also submitted a declaration of Jack Fay in connection with its request for

reexamination (together with the Uellendahl and McElhiney declarations submitted with Alps'

request, the "Reexamination Declarations").  That declaration also focuses on the teachings from

various Silipos publications.  It does not mention the Fay Liners or Mr. Fay's claim that he

manufactured and sold a product that predates and invalidates the '237 patent.

The Court makes the factual finding that Alps did not ask Messrs. Uellendahl,

McElhiney, or Fay to discuss the SSGL or Fay Liners in the Reexamination Declarations

because it knew the scope of reexamination proceedings does not include prior use or sale—*i.e*.,

that the declarants' claims in the Summary Judgment Declarations were not "material to

patentability in a reexamination proceeding."  Alps appropriately focused the Reexamination Declarations on printed publications such as the Comfort Zone Ad.

The PTO granted Alps' request and commenced reexamination proceedings.  Mr. Gayan represented OWW in those proceedings.  Once Mr. Gayan began focusing on those proceedings, he did not participate in the litigation.

The first issue for the Court is what information OWW had a duty to disclose at the time the PTO granted Alps' request.  The Court finds that, because the SSGL and the Fay Liners are not patents or printed publications, they are not "material to patentability in a reexamination proceeding" under § 1.555(b)(1).  And because OWW did not oppose an argument of unpatentability or assert an argument of patentability at that time, it had no affirmative duty to disclose information about the SSGL and/or the Fay Liners.  *See id*. § 1.555(b)(2).

OWW submitted (through Mr. Gayan) its first Information Disclosure Statement ("IDS") to the PTO on June 19, 2007.  In that statement, OWW submitted pictures of the sample 1215 Product, the shipping invoice it received from Mr. Scalise, and the statement of relevancy from Mr. Treanor to the PTO.  OWW did not submit the abandoned 1993 Silipos patent application or the Scalise letters to the PTO at this time.

The Court finds that the pictures, the invoice, and the Statement of Relevancy were not "material to patentability in a reexamination proceeding" at the time Mr. Gayan submitted them to the PTO.  The Court credits Mr. Gayan's testimony that he submitted the materials anyway because he wanted to be careful in satisfying his duty of candor to the PTO.

The Court similarly finds that neither the abandoned 1993 application nor the Scalise letters were "material to patentability in a reexamination proceeding" at the time OWW submitted its first IDS.  OWW therefore did not violate 37 C.F.R. § 1.555 by omitting those

60

materials from the IDS.  Alps' repeated reference to MPEP § 2001.06, which provides that "individuals may be or become aware of material information from various sources such as, for example . . . communications from or with competitors" did not obligate OWW to disclose actual communications such as the Scalise letters.

On June 21, 2007, the PTO rejected certain claims of the '688 patent (which was closely related to the '237 patent at that time).  The rejection stated that the claims were "unpatentable over the Silipos Silosheath as disclosed in the Sep 1994 O&P Publication, the Oct 1994 O&P Publication, [and] the Jan 1995 O&P Publication."  (Ex. D-73, at 2.)

The PTO held an interview on July 16, 2007 to discuss the rejection.  Mr. Gayan represented OWW at the interview.  Mr. Standley, Mr. Colvin, and Mr. Kania also attended the interview.

OWW's position at the interview was that the Silosheath—unlike the product claimed by the '237 and '688 patents—allowed gel to bleed through to the fabric's exterior.  OWW brought a sample Silosheath to demonstrate the bleed-through issue to the PTO.  OWW represented to the PTO that all Silosheaths it had examined from the relevant time period allowed gel to bleed through to the exterior of the fabric.

Following the interview, the PTO reversed course on the rejected claims of the '688 patent.  The PTO issued a Notice of Intent to Issue Ex Parte Reexamination Certificate stating that claim one of the '688 was valid because the prior art did not teach a tube sock-shaped covering "wherein the covering has a coating of a polymeric material residing on only an interior surface thereof."  (Ex. D-73.)  The PTO therefore focused on the issue of gel bleed through in reinstating the '688 patent.

Following a telephone interview with the PTO, OWW amended claim one of the '237 patent to incorporate the same "only an interior surface thereof" language. That language permitted OWW to distinguish the '237 patent from the Silosheath prior art.

The question here is whether OWW withheld or misrepresented "but-for" material information to the PTO during the 2007 interview. The Court finds that it did not. At that point in time, the PTO possessed the full testimony of Mr. Comtesse. The PTO therefore was aware that a Silipos representative claimed that Silipos manufactured and sold a product called the SSGL, which was different from the Silosheath and did not allow gel bleed through prior to the March 5, 1995 critical date. Despite that testimony, however, the PTO found (at least for purposes of reexamination) that the '688 and '237 patents were unique in that they claimed a product that did not allow gel bleed-through.

Alps claims that OWW withheld several pieces of "but-for" material information at this point in time: the sample 1215 Product, the Scalise letters, the abandoned 1993 Silipos patent application, the Summary Judgment Declarations, and the Fay Liners. The Fay Liners, however, are not "material to patentability in a reexamination proceeding" under either 37 C.F.R. § 1.55(a) (they are not patents or printed publications) or § 1.555(b) (they are unrelated to the Silosheath and the Silopos advertisements and therefore are unrelated to the PTO's June 21, 2007 rejection, to which OWW was responding at the interview). The Court therefore finds that the Fay Liners cannot be "but-for material" in the first reexamination.

Setting aside the issue of whether the remaining items were "material to patentability in a reexamination proceeding" under § 1.555, the Court finds that Alps failed to show that any of these items were "but-for" material during the first reexamination. The evidence suggests that the PTO had a sample 1215 Product (sent by Mr. Treanor) and that Mr. Gayan disclosed pictures

of the same in his first IDS.  Even if OWW had a second sample in its possession (such as the one it received from SPS in 1994) that it could have disclosed, there is no evidence that a second sample would have made a difference in the PTO's opinion.  Similarly, the Scalise letters and Summary Judgment Declarations prove only that other individuals shared Mr. Comtesse's position that Silipos manufactured a pre-critical date product that did not allow gel bleed through.  The abandoned 1993 Silipos patent application corroborates that position but proves nothing by itself.  As such, and because the PTO did not appear to consider Mr. Comtesse's testimony in making its first reexamination decision, the Court cannot conclude that the Scalise letters, the abandoned application, and/or the Summary Judgment Declarations would have made a difference at that stage of the proceedings.  The Court therefore finds that those items were not "but-for material" for purposes of this inequitable conduct analysis.

Alps offers the additional argument that the withheld information is but-for material because the Court relied on some or all of it in invalidating as obvious claims 18-19 and 21-23 of the '237 patent.  But that argument confuses "material to patentability" with "material to patentability in a reexamination proceeding."  Evidence that is material to an obviousness determination is not necessarily material to a rejection based on patents or printed publications.  Because OWW had a duty to disclose evidence that is "material to patentability in a reexamination proceeding" during the first reexamination, rather than the broader duty to disclose evidence that is "material to patentability," *see* 37 C.F.R. § 1.555, Alps' argument fails.

Alps also suggests that OWW misrepresented that the Silosheath and SSGL were the same product to the PTO; however, the Court finds no evidence that OWW took that position during the first reexamination proceeding.  Alps has not pointed to any statements during the first reexamination in which OWW represented or suggested that the Silosheath and SSGL were the

same product.  To the contrary, OWW represented that all pre-critical date Silosheaths it had

examined allowed gel bleed through, thereby suggesting that different variations of the

Silosheath existed.  There is no indication that OWW even referenced the SSGL during the first

reexamination proceedings.  There similarly is no conclusive evidence that OWW's statement

that all pre-critical date Silosheaths it had examined allowed gel bleed through was false.

Alps' final argument—that the PTO erred in considering the Silosheath and SSGL to be

the same product such that OWW had an affirmative duty "to point the examiner towards

evidence that would have corrected this misunderstanding," (ECF No. 274, at 44)—similarly

fails.  Three points are relevant here.  First, as stated above, there is no evidence that OWW's

representations during the first reexamination proceeding caused or contributed to any error by

the PTO.  Second, although Alps offered authority stating that a patent owner (and his/her/its

representatives) has a duty to disclose information in certain circumstances, Alps cites no

authority for the proposition that the patent owner must affirmatively argue against itself after

that information has been disclosed.  The patent rules actually suggest the opposite.  *See* 37

C.F.R. § 1.555(a) ("The duty to disclose all information known to be material to patentability in

a reexamination proceeding is deemed to be satisfied if all information known to be material . . .

was cited by the Office or submitted to the Office in an information disclosure statement."); *see*

*also id*. at §1.555(b) (stating that a patent owner only has a duty to provide information that is

"not cumulative to information of record").  And third, the differences between the Silosheath

and SSGL are only relevant if the pre-critical date SSGL did not allow gel bleed through.  Alps

has not identified any evidence OWW could have submitted that conclusively proves that fact.

Instead, all of the evidence to which Alps points is circumstantial proof of a hotly contested issue

in this litigation.  Alps' suggestion that OWW had an affirmative duty to point the PTO toward

that circumstantial evidence and then argue Alps' position with respect to that evidence goes beyond the duty of candor that the patent rules require.

For those reasons, the Court concludes that OWW did not withhold or misrepresent "but-for" material information during the first reexamination proceedings.  The Court therefore finds that OWW did not engage in inequitable conduct during those proceedings.

Following the conclusion of the first reexamination proceeding, Alps submitted a second request for ex parte reexamination of the '237 patent to the PTO.  Alps resubmitted several of the Silipos advertisements, excerpts of Mr. Comtesse's deposition, and a new declaration from Mr. Comtesse (signed on September 4, 2008) in an attempt to focus the PTO's attention on the Comfort Zone Ad and SSGL.

Alps did not submit the Summary Judgment Declarations, the Scalise letters, or the abandoned 1993 patent application to the PTO.  That fact further supports the Court's conclusion that such evidence was not "but-for" material to the PTO's decision in the first reexamination proceedings.

The PTO granted Alps' second request for reexamination.  On April 27, 2009, the PTO issued a non-final office action rejecting all claims of the '237 patent.  In its opinion, the PTO stated that claim one of the '237 patent is unpatentable over the Comfort Zone Ad as evidenced by Mr. Comtesse's declaration and testimony.  The PTO stated that the SSGL (as depicted in the Comfort Zone Ad) is different from the Silosheath "in that it has a Coolmax outer fabric layer rather than the nylon used in the Silosheath products."  (Ex. D-67, at 349.)

OWW responded to the first office action by arguing, *inter alia*, that the PTO misinterpreted Mr. Comtesse's testimony.  OWW stated that Mr. Comtesse's testimony actually supports a finding that the pre-critical date SSGL and Silosheath were the same product.  The

65

PTO rejected that argument in its final office action and found that the cited portion of testimony did not indicate that the SSGL and Silosheath were the same product.

OWW responded to the PTO's final office action on February 12, 2010.  It submitted the abandoned 1993 Silipos patent application to the PTO at that time.  In the remarks accompanying the disclosure, OWW (through Mr. Gayan) stated that it received the abandoned application from Alps' counsel on November 20, 2009.  OWW did not reference the fact that Mr. Scalise had informed OWW of the abandoned application in 1999.

Because OWW disclosed the application to the PTO, the Court finds that the Federal Circuit's observation that the BPAI was not aware of the same is incorrect.

Notwithstanding that fact, the Court finds that OWW misrepresented information to the PTO when it suggested that it became aware of the abandoned Silipos application on November 20, 2009.  Although the Court credits Mr. Gayan's testimony that he did not know about the abandoned application until 2009, he represented to the PTO that the "Patent Owner"—i.e., OWW—became informed of it at that time when OWW actually had knowledge of it years earlier.  (Ex. D-67, at 604).  Mr. Gayan signed his submission not on his own behalf but as "Attorney of Record for Patent Owner."  (*Id*. at 633.)  The Court finds that OWW failed to inform Mr. Gayan that it became aware of the application in 1999 and correct the misrepresentation to the PTO.

OWW made several additional arguments in its February 12, 2010 office action response.  Most notably, OWW argued that Mr. Comtesse was an interested party such that his testimony should be afforded less weight than that of a neutral party.  OWW also argued that Mr. Comtesse's testimony was uncorroborated such that it could not support the SSGL construction that Alps advanced.

On April 28, 2010, after OWW filed a notice of appeal, the PTO issued an Advisory Action in which it addressed many of OWW's arguments from its February 12, 2010 filing.  The PTO stated: "The arguments of Mr. Comtesse being an interested party and his testimony being uncorroborated are noted and in light of all the evidence are unconvincing . . . the Comfort Zone reference is the basis of the rejection, not the affidavit and deposition transcript (neither of which are a patent or printed publication and therefore cannot be the basis of a rejection – MPEP 2256 I. B) . . . ."  (Ex. D-67, at 912–13.)

OWW filed its appeal brief on June 14, 2010.  OWW argued in its brief that Mr. Comtesse's testimony is unreliable and should not have been used to corroborate the Comfort Zone Ad.  (Ex. D-67, at 1120.)  Specifically, OWW argued that Mr. Comtesse was an interested party such that the weight afforded to his testimony should be limited.  OWW stated that Mr. Comtesse was an interested party for several reasons: (1) he was the inventor of the product at issue, (2) he "is the owner and manager of Vorum Research Corporation . . . a company that appears to sell products that compete with products offered by Patent Owner," and (3) he "admitted that he continues to receive royalties on Socket Gel Liner products he helped develop for Silipos."  (*Id*. at 1133.)  OWW concluded that, because Mr. Comtesse is an interested party, his testimony was insufficient to corroborate the Comfort Zone Ad on the issue of whether the SSGL was manufactured using impermeable fabric.  OWW noted that "Requester has provided no other evidence of any sort in this regard."  (*Id*. at 1136.)

OWW cited portions of Mr. Comtesse's testimony after each of its arguments.  Regarding the argument that Mr. Comtesse continued to receive royalties from Silipos, OWW cited the following exchange:

Q.      Did you get a royalty on the Socket Gel Liners that we talked about –

A.      Oh, yes.

Q.      -- today?

A.      Yeah.

(*Id*. at 1133; *see also* ECF No. 114-3, at 5.)

OWW reiterated its arguments in its reply brief filed June 7, 2011.  *See* Ex. P-25, at 6, 9

(arguing that Mr. Comtesse is an interested party because he "is the owner and manager of a

company that appears to sell products that compete with products offered by Appellant and,

more importantly, continues to receive royalties on Socket Gel Liner products (e.g., the SSGL)

that he helped develop for Silipos" and that "the corroboration requirement is heightened in this

case because Mr. Comtesse is an interested party").  OWW also made additional representations

regarding the lack of corroborating evidence.  Specifically:

> [OWW] has previously discussed at length the requirement for
> corroboration of Mr. Comtesse's deposition testimony and declaration statements
> – especially since there is absolutely no documentary or physical evidence that
> describes or shows the alleged construction of the SSGL prior to the critical date
> of the '237 patent .
>
> . . .
>
> To be absolutely clear, the required corroborating evidence of SSGL
> construction is completely lacking in this case.  Both Requestor and Mr. Comtesse
> unequivocally state that the SSGL was different from the Silosheath only because
> the SSGL was allegedly manufactured with a Coolmax fabric. . . . [O]ther than
> Mr. Comtesse's testimony, there is absolutely no other evidence to support the
> alleged SSGL construction.

(*Id*. at 9–12.)

Mr. Gayan presented those arguments on OWW's behalf at a hearing before the BPAI on

July 20, 2011.  Mr. Gayan stated, among other things, that no one has ever produced an actual

SSGL, that there is no evidence that the product existed at that point in time, and that no one had

seen an SSGL at that time.  Mr. Gayan also stated that Mr. Comtesse invented the SSGL and that

he was still receiving royalties from Silipos.  Mr. Gayan summarized OWW's position as
follows:

> No one has ever seen a single-socket gel liner.  The prosthetists that we've had
> submit declarations, they knew the Silosheath, they knew the Iceross.  No one had
> ever seen a single-socket gel liner at that time.  So I mean, I know that they're
> alleging that this thing existed and I know that they're alleging what the
> construction is, but the only way, the only way, in my opinion, that they come
> close to proving it is if you believe everything that Mr. Comtesse says in his – you
> believe the parts you want out of Mr. Comtesse's deposition because the rest is
> contradictory.  On top of that, he's an interested party.  I mean, he has admitted
> that he now runs a company that technically makes products that would appear to
> compete with the Appellant.  On top of that, he's still receiving royalties from
> products that Silipos sells that have this socket gel technology.  Worse, I mean,
> his testimony is uncorroborated.  That's all they have is that ad.

(*Id*. at 1379–80.)

The Court finds that several of these statements constitute misrepresentations to the PTO.

First, as the Federal Circuit noted, it clearly was a misrepresentation to suggest that Mr.

Comtesse still received royalties from Silipos.  The portion of testimony OWW cited does not

support that assertion.  Other portions of Mr. Comtesse's testimony clearly refute that assertion.

*See Willow Wood*, at 26 (setting forth several lines of testimony in which Mr. Comtesse

unequivocally stated that he had no relationship with Silipos and did not receive royalties

therefrom at the time of his deposition).  Mr. Gayan admitted that he was incorrect on this point.

Second, it was a misrepresentation to suggest that Mr. Comtesse admitted to being the

inventor of the SSGL, when he merely testified as to certain facts that could support a finding

that he meets the legal definition of "inventor."  OWW (through Mr. Gayan) did not qualify its

statements in such a way.

Third, OWW misrepresented the amount of evidence that corroborates Mr. Comtesse's

statements.  Alps identified the Summary Judgment Declarations, the Scalise letters, the

Summary Judgment Photographs, and the evidence regarding the Fay Liners as corroborating evidence.  Excluding the Fay Liners, which have no ascertainable connection to Mr. Comtesse, the Court agrees with Alps that this evidence (along with the abandoned Silpos application) corroborates Mr. Comtesse's testimony.[6]  Stating that no such evidence exists was, therefore, a misrepresentation.

The question becomes whether these misrepresentations were "but-for" material.  The Court will address each misrepresentation separately.

First, the Court finds that Mr. Gayan's failure to qualify his statements about Mr. Comtesse being the inventor of the SSGL were not but-for material to the BPAI's Order.  From the oral argument transcript, it is clear that the BPAI was familiar with relevant portions of Mr. Comtesse's testimony regarding inventorship and questioned Mr. Gayan accordingly.  *See* Ex. D-67, at 1389 (pointing out that Mr. Comtesse testified to developing a line of products such that the issue of inventorship was "a little ambiguous").  Mr. Gayan argued that Mr. Comtesse testified to being the head of Research & Development at Silipos (responsible for the whole liner program) and that his position suggests that he invented and developed the relevant products. *See id*.  There is no indication that the BPAI was misled on this point.  *See id*. (Judge Lebovitz acknowledges: "[W]hether [Mr. Comtesse] was the inventor or not, he is testifying, I guess, as to his personal role in the development of it"); *see also id*. at 1404 (setting forth the BPAI's factually correct observation that Mr. Comtesse was responsible for research & development at Silipos at the time it began making the products at issue).

_____

[6] This evidence corroborates Mr. Comtesse's testimony even though it does not conclusively answer any of the disputed questions about whether the pre-critical date SSGL existed and allowed gel bleed through.  The Scalise letters, for example, prove that a Silipos attorney took the position in 1999 that Silipos manufactured and sold a pre-critical date product in the United States that—as Mr. Comtesse testified—did not allow gel bleed-through.  Once OWW characterized Mr. Comtesse as a confused witness who (while testifying several years after the fact in 2006) incorrectly believed that such a product existed before March 5, 1995, the Scalise letters become relevant as evidence refuting that characterization and supporting the PTO's original belief that Mr. Comtesse testified accurately about the SSGL's construction and characteristics.

The Court reaches the opposite conclusion with respect to the other misrepresentations. The BPAI appears, from the oral hearing transcript, to have accepted Mr. Gayan's misstatement that Mr. Comtesse was still receiving royalties from Silipos at the time of the hearing:

> MR. GAYAN: . . . I mean, understand that [Mr. Comtesse] still gets royalties from Silipos on products they sell. One of the reasons that they don't sell products right now that compete with [OWW] is because of these patents. If these patents go away, then they right [sic] to sell all of the products they want and he has a chance to make more royalties. So he's clearly an interested party as well. It's not just that he's an inventor. He's not a neutral third party.
>
> JUDGE LEBOVITZ: Okay. Well, he's not neutral . . .

*Id*. at 1390. The BPAI later stated that "[i]t is undisputed that Comtesse is an interested third party," *id*. at 1405, and went on to discuss the heightened need for corroboration of Mr. Comtesse's testimony. Moreover, unlike the nuanced misrepresentation about Mr. Comtesse being an inventor, Mr. Gayan's statements about royalties flatly contradict Mr. Comtesse's testimony. The Court therefore is persuaded by the Federal Circuit's guidance that such statements are tantamount to the filing of an unmistakably false affidavit such that materiality is presumed.

The Court similarly finds that the misrepresentations about corroborating evidence were but-for material to the BPAI's decision. It cannot be disputed that the BPAI accepted Mr. Gayan's representations that no corroborating evidence existed. *See id*. at 1406 (reinstating the '237 patent because the BPAI "[had] not been directed to evidence sufficient to corroborate the Comtesse testimony indicating that the Liner was covered in fabric with no gel bleed-through"). It similarly cannot be disputed that the issue of whether there existed evidence to corroborate Mr. Comtesse's testimony was a dispositive issue on appeal. *See id*.; *see also id.* at 1402 (characterizing the dispositive issue on appeal as follows: "Did the Examiner err in crediting the uncorroborated testimony of a third party in support of the rejections?"). The Court finds that,

71

absent OWW's misrepresentation that no corroborating evidence existed, the BPAI would not have reversed the Examiner and reinstated the '237 patent. As such, the misrepresentations regarding corroborating evidence were but-for material to the BPAI's decision.[7]

The final issue is that of intent. The Federal Circuit suggested that Alps can satisfy its burden on this issue by demonstrating a "threshold level of deceptive intent," at which time the Court should consider OWW's good faith explanation for the misconduct. *Willow Wood*, at 29 (citing *Therasense*, 649 F.3d at 1291); *see also Larson Mfg.Co. of S. Dakota, Inc. v. Aluminart Prods. Ltd.,* 559 F.3d 1317, 1341 (Fed. Cir. 2009) (stating that the accused infringer must prove the threshold level of deceptive intent by clear and convincing evidence). The Federal Circuit further stated that the issue for this Court is whether "the inference of deceptive intent that we hold could be drawn . . . remains after assessing the credibility of OWW's witnesses." *Willow Wood*, at 30.

Regarding Mr. Gayan's statements about royalties, the Court finds that Alps sufficiently demonstrated a threshold level of deceptive intent. Several facts support that conclusion. First, because a review of the oral argument transcript suggests that Mr. Gayan was very familiar with the contents of Mr. Comtesse's deposition testimony, the Court makes the factual finding that Mr. Gayan read the Comtesse deposition transcript in full at some point before or during OWW's appeal. Yet he continued to rely on the false representation that Mr. Comtesse was still receiving royalty payments from Silipos, despite Mr. Comtesse's unequivocal testimony that he was not. Even if Mr. Gayan had interpreted another portion of Mr. Comtesse's testimony differently (such

---

[7] OWW suggests that the evidence was not but-for material because Alps did not submit it with its second request for reexamination, but this argument is without merit. Alps could not have known at the time it submitted its second request that the PTO's focus would shift from prior patents or publications to the secondary issue of whether evidence corroborated Mr. Comtesse's testimony. Because Alps was precluded from submitting additional evidence at the time the PTO began focusing on that issue, the fact that Alps did not submit the disputed evidence is not relevant to the issue of but-for materiality.

as the portion of testimony Mr. Gayan cited in his brief, which does not support his assertion that Mr. Comtesse was still receiving royalties), he never indicated that the testimony was ambiguous or contradictory on this point.  Instead, he repeatedly made the unqualified argument that Mr. Comtesse was receiving royalty payments from Silipos in various briefs and at oral argument. That evidence is sufficient for the Court to infer deceptive intent.

The inquiry then shifts to OWW's witnesses' purported explanations for the misconduct. *See Willow Wood*, at 29.  Because both OWW (as the patent holder) and Mr. Gayan (as the patent holder's representative) owed a duty of candor to the PTO, *see* 37 C.F.R. § 1.555(a), the Court examines Mr. Gayan's and Mr. Colvin's testimony with respect to this particular misrepresentation.

Mr. Gayan provided the following explanations for his misrepresentation: he made a mistake in interpreting the Comtesse testimony, he cited a portion of testimony in support of his assertion thereby demonstrating that he was not trying to deceive the PTO, and he knew the PTO had the entire Comtesse deposition in front of it thereby suggesting he would not purposefully have misrepresented the testimony contained therein.  OWW also argued in its brief that Mr. Gayan's history of disclosing information in previous Information Disclosure Statements suggests that he intended to be forthcoming with the PTO.

The Court agrees with OWW.  Although Alps met its threshold burden in proving intent, there exist too many questions about whether Mr. Gayan knew his representations about royalties were false for the Court to conclude that deceptive intent is the single most reasonable inference to be drawn from the evidence.  For example, although the portion of testimony Mr. Gayan cited to support his statements about royalties does not, in fact, support his position, it at least creates a plausible scenario as to how the misinterpretation occurred.  *See* Ex. D-67, at 1133; ECF No.

114-3, at 5.  Similarly, the fact that the BPAI had Mr. Comtesse's testimony in front of it and appeared to be familiar with the same during oral argument makes it less likely that Mr. Gayan intentionally tried to mischaracterize that testimony.  And finally, Mr. Gayan previously had disclosed information that was not material to patentability in a reexamination proceeding.  The Court therefore credits Mr. Gayan's testimony that he intended to be forthcoming with the PTO.

As for whether OWW acted with deceptive intent in allowing Mr. Gayan to misrepresent Mr. Comtesse's testimony on its behalf, Mr. Colvin testified that he did not read Mr. Comtesse's deposition testimony in full and relied on Mr. Gayan to summarize and characterize the content thereof.  The Court accepts that testimony.  Without additional evidence that OWW knew Mr. Gayan's statements about royalties were false, the Court concludes that OWW did not commit inequitable conduct in misrepresenting the issue of royalties to the PTO.

The more difficult question is whether OWW intentionally misrepresented the amount of evidence corroborating the Comtesse testimony.  Even if the Court accepts Mr. Gayan's testimony that he did not know about the Scalise letters, the Summary Judgment Declarations or the Summary Judgment Photographs until after the reexamination proceedings concluded, the more troubling issue is whether OWW intentionally allowed its patent prosecution counsel to misrepresent the evidence on its behalf.

The following factual findings support the inference that OWW acted with deceptive intent.  First, Mr. Colvin is the listed inventor on about twenty patents and has overseen the prosecution of about thirty patents on OWW's behalf.  He was responsible for overseeing this litigation and both reexamination proceedings involving the '237 patent.  Mr. Colvin understood that Mr. Gayan was representing OWW and that every representation he (Mr. Gayan) made to the PTO and BPAI was made on OWW's behalf.  Mr. Colvin understood that OWW had a duty

of candor to the PTO separate and apart from its attorney's duty of candor.[8]  The BPAI even

issued a reminder at oral argument that it was OWW—and not just its attorney—who was

responsible for providing relevant information to the PTO.  *See* Ex. D-67, at 1338 (after Mr.

Gayan informs the BPAI that he personally is not aware of the latest updates in the litigation, the

BPAI responds, "Okay, but it's your – it's the patent owner's duty to inform us as to decisions

that would impact our ruling").

Mr. Colvin knew that, in 1999, a Silipos attorney had advanced the same position as Mr.

Comtesse.  Mr. Colvin knew that the attorney claimed the abandoned patent application was

evidence of that position.  Mr. Colvin also knew, in approximately late 2006, that three

individuals had offered testimony corroborating Mr. Comtesse's position and that Alps had

provided pictures of what it claimed to be a pre-critical date SSGL.  He therefore knew that

existing evidence corroborated Mr. Comtesse's testimony.

Mr. Colvin participated in preparing the briefs and filings to the PTO during the appeal.

He was responsible for sending OWW's information to Mr. Gayan during that time.  Mr. Colvin

certainly would have reviewed the filings Mr. Gayan submitted on OWW's behalf and been

aware of the position Mr. Gayan planned to present at oral argument.  Mr. Colvin therefore had

the opportunity to correct the misrepresentations regarding corroborating evidence.

Mr. Colvin did not disclose the Summary Judgment Declarations, the Summary

Judgment Photographs, or the Scalise letters to the PTO.  There is no evidence that Mr. Colvin

raised that information with Mr. Gayan, despite his (Mr. Colvin's) knowledge of the Standley

Law Group's "wall" between its patent and litigation attorneys.  Just as he did not take any

---

[8] *See* 37 C.F.R. § 1.555(a) ("*Each individual associated with the patent owner* in a reexamination proceeding has a duty of candor and good faith in dealing with the Office, which includes a duty to disclose to the Office all information known to that individual to be material to patentability in a reexamination proceeding." (emphasis added)).

action to correct the misrepresentation about the date OWW became aware of the abandoned

1993 Silipos patent application, Mr. Colvin similarly did not take any action to correct Mr.

Gayan's misrepresentations that no evidence existed that would corroborate Mr. Comtesse's

testimony.

From these factual findings, the Court concludes that Alps satisfied its threshold burden

of demonstrating deceptive intent by clear and convincing evidence.  The inquiry then shifts to

OWW's explanation for its conduct.

Mr. Colvin testified that he did not provide the evidence from Alps' summary judgment

motion to Mr. Gayan or the PTO because he did not know about it.  As stated above, however,

that testimony is not credible.  It is inconceivable that the OWW employee responsible for its

patent litigation did not have access to confidential information that could cause the Court to

invalidate one of OWW's most important patents simply because he did not sign the Protective

Order.

That testimony is particularly not credible in this instance because the material at issue

was not marked "Confidential" or "Confidential – Attorney's Eyes Only."  The Protective Order

is clear that confidential documents must be so marked and that, if one document in a filing is

confidential, the entire filing shall be placed in an envelope to be filed under seal.  Moreover,

neither the Summary Judgment Declarations nor the Summary Judgment Photographs contain

trade secret or proprietary information that would justify a confidential designation.  It is

unreasonable to infer that Messrs. Colvin, Standley, and Speed believed the Protective Order

prevented Mr. Colvin from reviewing that information.  And even if they had questions about

whether Alps intended to designate its motion and exhibits as confidential by filing them under

seal, it is unreasonable to infer that they made the decision to bar Mr. Colvin's access to the same without raising those questions with either Alps or this Court.

Having found that Mr. Colvin knew of the Summary Judgment Declarations and the Summary Judgment Photographs in 2006, the Court finds that, once the PTO began to focus on whether evidence corroborated the Comtesse testimony, Mr. Colvin had a duty to either present that information to the PTO or (at the very least) to Mr. Gayan for purposes of presenting it to the PTO. *See* 37 C.F.R. § 1.555(a). At that point, even if Mr. Colvin had questions about whether the Protective Order prevented disclosure, Mr. Gayan could have informed him of the PTO's rules regarding disclosure of material subject to a protective order. *See* MPEP § 724.01–724.02. There is no evidence that Mr. Colvin presented the information to Mr. Gayan, that anyone from OWW or on OWW's behalf contacted Alps about whether it intended to designate the summary judgment exhibits as confidential, or that anyone contacted the Court to raise the issue of the Protective Order and OWW's duty of candor to the PTO. There simply is no evidence of a good faith attempt to meet OWW's duty of candor to the PTO in this instance.

Additionally, even if Mr. Colvin reasonably believed he could not disclose the Summary Judgment Declarations or the Summary Judgment Photographs to Mr. Gayan, he at least had a duty to prevent Mr. Gayan from making the affirmative misrepresentation that no corroborating evidence existed to support Mr. Comtesse's testimony. In allowing Mr. Gayan to repeatedly argue (on OWW's behalf) that Mr. Comtesse was confused and isolated in his position that the pre-critical date SSGL did not allow gel bleed-through, when in fact other individuals shared and corroborated that position, OWW went beyond any good faith defense the Protective Order provides.

As a final point, the Court notes that OWW's reliance on the Protective Order does not address the Scalise letters or the abandoned Silipos application.  It is undisputed that those documents were not designated as "Confidential" or "Confidential – Attorney's Eyes Only" under the Protective Order.  Mr. Colvin had no explanation for his failure to present those documents to either Mr. Gayan or the PTO.  That fact further suggests that OWW acted not because it made a good-faith mistake in misinterpreting the Protective Order but because it intended to deceive the PTO.

For those reasons, the Court concludes that the most reasonable inference to be drawn from the evidence is that OWW acted with deceptive intent in misrepresenting the existence of evidence corroborating the Comtesse testimony.  Alps therefore has met its burden in proving deceptive intent by clear and convincing evidence.  The Court concludes that OWW engaged in inequitable conduct before the PTO during its appeal of the second reexamination of the '237 patent.

The BPAI issued its decision reinstating the '237 patent on September 30, 2011.  Alps then continued to incur substantial litigation costs in defending OWW's claims for infringement of the '237 patent.

### E.  Issues Remaining

The final issue for the Court is the consequences of its finding that OWW engaged in inequitable conduct.  Three sub-issues exist: (1) is Alps entitled to a ruling that the '237 patent is unenforceable, (2) are the '688 patent and related Patent Nos. 7,291,182 (the " '182 patent"), and 8,523,951 (the " '951 patent")  unenforceable, and (3) is Alps entitled to attorney's fees?

Regarding the first issue, "inequitable conduct regarding any single claim renders the entire patent unenforceable." *Therasense,* 649 F.3d at 1288.  The Court therefore agrees with Alps that the inequitable conduct finding renders all claims of the '237 patent unenforceable.

Regarding the second issue, Alps argues that the related '688, '182, and '951 patents are unenforceable because they are part of the same family of patents.  Alps argues that this Court has discretion to declare related patents invalid once it makes a finding of inequitable conduct.  *See* ECF No. 274, at 60.

Even if the Court has such discretion, however, it declines to exercise it in this case.  The validity and/or enforceability of the '688, '182, and '951 patents are not and have never been at issue in this litigation.  *See* Am. Compl., ECF No. 120.  In its amended counterclaim for inequitable conduct, Alps requested that the Court declare only the '237 patent invalid and unenforceable.  *See* ECF No. 135, at 16–17.  Alps did not mention the '688 in its request for relief and did not mention the '182 or '951 patents in its amended counterclaim at all. Unsurprisingly, Alps' arguments regarding the similarity of the '688, '182, and '951 patents also go beyond the scope of evidence presented in this case: Alps states, for example, that the '688 patent has been amended to include an adaptor that the '237 patent does not claim, but does not cite to any evidence or witness testimony in support of that assertion.[9]  The same is true for Alps' assertions that "[t]he '182 patent is a continuation of the '237 patent and is subject to a double patenting disclaimer based on the '688 patent" and that "[t]he '951 patent is derived from an abandoned divisional application of the application that matured into the '688 patent."  (ECF No. 274, at 60.)  Accordingly, although the Court's finding of inequitable conduct might be relevant

_____

[9] Alps claims that the adaptor is of no consequence because the '688 patent should not have emerged from the first reexamination; however, the Court found no inequitable conduct during those proceedings.  Alps' arguments on this point therefore are moot.

in proceedings involving related patents, the Court declines to rule on the enforceability of the '688, '182, and/or '951 patents in the context of this dispute.

The Court now turns to the final issue of whether Alps is entitled to attorneys' fees. Pursuant to 35 U.S.C. § 285, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  "An 'exceptional' case is simply one that stands out from others with respect to the substantive strength of a party's litigation position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated."  *Octane Fitness, LLC v. ICON Health & Fitness, Inc*., 134 S. Ct. 1749, 1756 (2014). A finding of inequitable conduct is one basis for finding a case "exceptional" and awarding attorneys' fees.  *Therasense*, 745 F.3d at 516.

The parties offer little authority on this issue.  For its part, Alps cites *Octane Fitness* and argues that OWW obtained or preserved several unwarranted patents by engaging in inequitable conduct and that Alps has suffered substantial damages as a result.  OWW does not offer any argument or authority that refutes Alps' position.

Given the finding of inequitable conduct and the fact that Alps prevailed on OWW's infringement claims, the Court concludes that this case is exceptional within the meaning of 35 U.S.C. § 285.  The Court finds that Alps is entitled to its attorneys' fees incurred litigating this case after the BPAI issued its September 30, 2011 decision on the second reexamination.

### III.    CONCLUSION

For the foregoing reasons, the Court finds that Alps is entitled to judgment in its favor on its claim that OWW engaged in inequitable conduct during the second reexamination proceedings.  The Court further finds that Alps is entitled to its attorneys' fees incurred since September 30, 2011, in this litigation.

The Court **DIRECTS** the Clerk of Court to enter final judgment as to Alps' inequitable conduct counterclaim in Alps' favor.  The Court also **STAYS** the deadline by which Alps may file a motion specifying the amount of attorneys' fees to which it is entitled.  Should one or both parties appeal this Opinion and Order, Alps shall file notice with this Court within fourteen days of entry of the Federal Circuit's mandate, at which time the Court will reactivate this case to address any remaining issues.  If the deadline to appeal this Opinion and Order expires with neither party filing a notice of appeal, this matter shall be considered reopened and Alps shall have an additional fourteen days from that date to file its motion for attorneys' fees.

**IT IS SO ORDERED.**

/s/ Gregory L. Frost
GREGORY L. FROST
UNITED STATES DISTRICT JUDGE