## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

**THE OHIO WILLOW WOOD COMPANY,**

     **Plaintiff,**

                                       **Civil Action 2:04-cv-01223**
                                       **Chief Judge Edmund A. Sargus, Jr.**
     **v.**                            **Chief Magistrate Judge Elizabeth P. Deavers**

**ALPS SOUTH, LLC,**

     **Defendant.**

## REPORT AND RECOMMENDATION

     This matter is before the Court for a Report and Recommendation of Defendant's former counsel, Shumaker, Loop, & Kendrick, LLP's ("Shumaker") request for attorneys' fees. For the following reasons, the Undersigned **RECOMMENDS** that Shumaker's request be **GRANTED** and Shumaker's attorneys' fees be found reasonable and awarded. The Undersigned, therefore, **RECOMMENDS** the imposition of a $639,946.18 attorney charging lien on any settlement funds paid to Defendant Alps South, LLC ("Alps") in this matter.

**I.**

     Plaintiff, The Ohio Willow Wood Company ("OWW") initiated this case on December 27, 2004, by filing a Complaint. (ECF No. 1.) OWW filed an Amended Complaint on November 18, 2011. (ECF No. 120.) OWW accused Defendant Alps of infringing one of its patents, U.S. Patent No. 5,830,237 (the '237 patent). (*Id.* at ¶ 9.) Alps, in turn, brought a counterclaim alleging, among other things, that OWW had procured the '237 patent by inequitable conduct. (ECF No. 127 at ¶¶ 92–93.) On August 10, 2012, the Court ruled on the

parties' cross-motions for summary judgment, holding that the asserted claims of the '237 patent were invalid and that OWW had not engaged in inequitable conduct. (ECF No. 209.) Plaintiff and Defendant each appealed to the Federal Circuit, which affirmed the Court's decision that the asserted claims of the '237 patent were invalid but reversed the Court on its decision that OWW had not engaged in inequitable conduct. (ECF No. 226.) The case was remanded. (*Id.*)

Following a bench trial on the issue of OWW's inequitable conduct, the Court ruled in Defendant Alps' favor. (ECF Nos. 278 & 279.) The Court found that OWW engaged in inequitable conduct during the second reexamination proceedings. (*Id.*) The Court further found that because this was an "exceptional" case under 35 U.S.C. § 285, Defendant Alps was entitled to its attorneys' fees incurred since September 30, 2011. (*Id.*) OWW again appealed the Court's judgment to the Federal Circuit, which affirmed the Court's decision in February 2016. (ECF No. 290.) The case was again remanded, with the only remaining issue being the determination of the amount of attorneys' fees owed to Defendant Alps. (ECF No. 297.) Prior to a decision from the Court on this issue, OWW and Alps settled the case and filed a stipulated dismissal. (ECF No. 305.)

On July 11, 2016, Defendant's former counsel, Shumaker, moved for an Attorney Charging Lien. (ECF No. 299.) Shumaker represented Defendant Alps from 2008 until December 16, 2015 when Alps discharged the firm. (*Id.* at pg. 1–2.) Through the charging lien, Shumaker seeks to recover from Alps unpaid fees for legal services and unreimbursed expenses. (*Id.*) Shumaker represents that the reasonable value of the legal services it provided to Defendant is $1,236,803.58, of which $614,893.08 remains unpaid. (*Id.* at pg. 2.) Shumaker further represents that it advanced $64,744.42 in expenses for this case, of which $25,053.10 is still unreimbursed. (*Id.*) Defendant filed a Response in Opposition to the Motion on August 4,

2016, contending that the $700,539.84 already paid is adequate compensation for Shumaker's

legal services.  (ECF No. 300.)  On August 17, 2016, Shumaker filed its Reply.  (ECF No. 302.)

The Court granted Shumaker's Motion on September 19, 2017 and ordered the imposition of a

$639,946.18 charging lien on any settlement funds paid to Alps in this matter.  (ECF No. 306.)

The lien covered the amount Alps owed Shumaker in unpaid legal fees ($614, 893.08) and

unreimbursed expenses ($25,053.10).  (*Id.*)

On October 19, 2017, Defendant moved for reconsideration of the Court's Order.  (ECF

No. 307.)  Shumaker filed a Response in Opposition on November 6, 2017.  (ECF No. 310.)  On

February 14, 2018, the Court granted Defendant's Motion for Reconsideration in part, granting

Defendant's request that the Court hold an evidentiary hearing[1] and ordered Shumaker to file

with the Court the invoice and billing information supporting its charging lien request.  (ECF No.

311.)  On June 15, 2018, Chief Judge Edmund A. Sargus, Jr. referred the evidentiary hearing on

Shumaker's request for attorneys' fees and expenses to the Undersigned pursuant to 28 U.S.C. §

636(b).  (ECF No. 320.)  The Undersigned held the evidentiary hearing on October 30, 2018 and

October 31, 2018.  At the close of the evidentiary hearing, the Undersigned requested Defendant

and Shumaker to submit briefs with respect to the proper standard to apply to Shumaker's

---

[1] "When a former client challenges the right to attorney fees or disputes the amount of fees
claimed, a trial court cannot summarily award attorney fees.  The trial court must first make a
determination that the attorney fees are reasonable and such determination can only be made
through the evidentiary process.  *Uebelacker v. Cincom Systems, Inc.*[, 608 N.E.2d 858, 863–
64 (Ohio Ct. App. 1992)].  The former client is entitled to offer evidence of any credits,
counterclaims, or defenses as well as to challenge whether or not the attorney helped to create
the monetary judgment.  While this may be better accomplished through a separate action, it
need not be.  Regardless of the procedure used, evidence must be presented and an opportunity
to challenge and defend against such a claim must be provided."  *First Bank of Marietta v.
Roslovic & Partners, Inc.*, 741 N.E.2d 917, 926 (10th Dist. Ohio 2000).

request for attorneys' fees.  Both Defendant and Shumaker submitted briefs on December 4, 2018.  (ECF Nos. 332 & 333.)

## II.

"An attorneys' charging lien is an equitable right to be paid for his [or her] services out of the proceeds of the judgment obtained by his [or her] labor and skill." *Exact Software v. Infocon Systems, Inc.*, No. 3:03-cv-7183, 2011 WL 2490594, at *2 (N.D. Ohio June 22, 2011) (internal quotations and citations omitted).  Under Ohio common law, attorneys have a right to assert a lien against a judgment they obtain on behalf of their client. *Filius v. Outdoor Sports Headquarters, Inc.*, No. C-3-90-358, 1995 WL 1612532, at *2 (S.D. Ohio May 18, 1995); *Garrett v. City of Sandusky*, 2004-Ohio-2582, ¶23 (6th Dist.) ("Ohio courts recognize an attorney's equitable right to enforce a lien on a client's judgment, decree or award, for payment of attorney fees earned in the prosecution of litigation to judgment, and will lend their aid to maintain and enforce such a lien.") (citation omitted).  The Ohio Supreme Court outlined the concept of an attorney charging lien in *Cohen v. Goldberger*, 141 N.E. 656 (Ohio 1923).  As the court explained:

> The right of an attorney to payment of fees earned in the prosecution of litigation to judgment, though usually denominated a lien, rests on the equity of such attorney to be paid out of the judgment by him obtained, and is upheld on the theory that his services and skill created the fund.

*Id.* at Syllabus, ¶ 1.  Although *Cohen* describes a lien attached to a judgment, courts have not interpreted this language as prohibiting the attachment of a lien to settlement proceeds. *See, e.g.*, *Filius*, 1995 WL 1612532, at *2–3; *Devis v. Pineview Ct. Condo. Ass'n*, 2015-Ohio-2704, ¶¶ 5, 11.  Nor have courts interpreted *Cohen*'s language as prohibiting the attachment of a lien when an attorney is discharged before the lawsuit is settled (or final judgment is entered in the case). *See, e.g.*, *Filius*, 1995 WL 1612532, at *2; *Cuyahoga Cnty. Bd. of Comm'rs v. Maloof Props.*,

*Ltd.*, 968 N.E.2d 602, 715–16 (8th Dist. Ohio 2012).  Additional factors that Ohio courts have considered when deciding whether to impose a charging lien include the following:

> (1) the right of the client to be heard on the merits; (2) the right of an attorney to invoke the equitable jurisdiction of the courts to protect his fee for services rendered; (3) the elimination of unnecessary and duplicative litigation; (4) the opportunity for the client to obtain counsel to litigate the claim for attorney fees; (5) the propriety of an order as opposed to a judgment; (6) a forum for the presentation of witnesses, if necessary; and (7) the equitable nature of the proceeding.

*Fire Prot. Res., Inc. v. Johnson Fire Prot. Co.*, 594 N.E.2d 146, 149–50 (6th Dist. Ohio 1991).

Ultimately though, the decision to impose an attorney charging lien is based on the facts and circumstances of the particular case and is left to the sound discretion of the court.  *Kerger & Hartman, LLC v. Ajami*, 54 N.E.3d 682, 686 (6th Dist. Ohio 2015).

### III.

#### A.  *Cohen* Analysis

The Court has already undertaken an analysis of whether Shumaker's request that an attorney charging lien be placed on any settlement funds obtained by Alps satisfies the requirements outlined in *Cohen* and the additional factors analyzed by Ohio courts.  (ECF No. 306, at pg. 4–6.)  The Court found as follows on the issue:

> Shumaker requests that an attorney charging lien be placed on any settlement funds obtained by Alps.  As noted above, Shumaker litigated the case to judgment.  And given Shumaker's extensive involvement in the case, the Court concludes that the judgment [ECF No. 279] was procured through Shumaker's services and skill.  Shumaker represented Alps from 2008 until December 16, 2015.  (*See* Mot. at 1–2 [ECF No. 299].)  During that time, Shumaker drafted a motion for summary judgment, litigated an appeal to the Federal Circuit, tried the inequitable conduct portion of the case before this Court, obtained a judgment for Alps, and defended that judgment in the second appeal to the Federal Circuit.  (*See id.* at 2–3.)

> Because the requirements outlined in *Cohen* are met, the Court considers the additional factors analyzed by Ohio courts.  *See Fire Prot. Res.*, 72 Ohio App. 3d at 210–11.  Alps obtained new counsel and has presented arguments on the merits of Shumaker's Motion for an Attorney Charging Lien.  (*See* Mem. in Opp'n at 1–3

[ECF No. 300].) Shumaker has not engaged in inequitable conduct that would cause the Court to question whether Shumaker should be permitted to invoke the Court's equitable jurisdiction. Imposing an attorney charging lien on the settlement funds might (depending on the settlement amount) eliminate the need for Shumaker to file a separate suit against Alps for the recovery of attorneys' fees and expenses. Neither party has objected to the propriety of an order as opposed to a judgment regarding the unpaid attorneys' fees and expenses. Nor has either party objected to this Court being an appropriate forum for the presentation of witnesses, if necessary.

Alps argues that the equities in this case do not favor the imposition of an attorney charging lien and that its partial payment of the attorneys' fees and expenses represents adequate compensation because Shumaker (i) breached a duty of care during the representation, (ii) failed to adequately inform Alps why certain fees are owed, and (iii) neglected to adequately assert the unenforceability of two patents, U.S. Patent Nos. 6,964,688 and 7,291,182 (the '688 and '182 patents), which purportedly resulted in Alps losing its right to collect attorneys' fees regarding those patents. (*See* Mem. in Opp'n at 2.)

Neither of the first two arguments shifts the balance of equities in Alps's favor. Alps provides no explanation of how Shumaker allegedly breached a duty of care or why this breach justifies withholding $614,893.08 in fees and $25,053.10 in expenses. (*See* Mem. in Opp'n at 2–3.) Nor has Alps explained why Shumaker's purported communications deficiencies justifies these withholdings. (*See id.*)

Alps's third argument also falls flat. The Court explained in its Opinion and Order following the bench trial that Alps's amended counterclaim "did not mention the '688 [patent] in its request for relief and did not mention the '182 . . . patent[] . . . at all." (Sept. 24, 2014 Op. & Order at 79 [ECF No. 278].) And as the Court further explained, Alps's arguments for finding the '688 and '182 patents unenforceable were unsupported by evidence or witness testimony. (*See id.*) Because of this failure to address the '688 and '182 patents in the amended counterclaim or at trial, the Court declined to rule on the enforceability of those patents. (*See id.* at 79–80.) The Federal Circuit later affirmed this holding. (*See* Feb. 19, 2016 Fed. Cir. Decision at 18–19 [ECF No. 290].) Alps complains that it lost its right to obtain attorneys' fees from OWW relating to the '688 and '182 patents due to Shumaker's failure "to adequately assert the unenforceability of [the] related [patents] by presenting proper evidence at the district court." (Mem. in Opp'n at 2.) But as Shumaker notes, Alps was involved in separate litigation, in this Court and in the Middle District of Florida, regarding the enforceability of the '688 and '182 patents. (*See* Reply at 4 [ECF No. 302].) If Alps wanted to pursue attorneys' fees relating to those patents, it could have pursued attorneys' fees in the other cases in which the patents were actually at issue. *See* Answer and Counterclaim at 15–16, 40–41, *The Ohio Willow Wood Co. v. Alps South, LLC*, No. 2:05-cv-1039 (S.D. Ohio Jan. 11, 2012), ECF No. 244 (concerning the '688 patent); Complaint and Demand for

Jury Trial at 1–4, *Alps South LLC v. Ohio Willow Wood Co.*, No. 8:07-cv-2076 (M.D. Fla. Nov. 13, 2007), ECF No. 1 (concerning the '182 patent).

Whether the Court would have awarded attorneys' fees if the '688 and '182 patents had been part of this case is also far from certain. *See* 35 U.S.C. § 285 (stating that a court may award reasonable attorneys' fees to the prevailing party only in "exceptional cases"); *Therasense, Inc. v. Becton, Dickinson & Co.*, 745 F.3d 513, 518 (Fed. Cir. 2014) ("[A] district court may exercise broad discretion in awarding fees and setting the amounts of fees."). And Alps, in any event, can only collect attorneys' fees for work that was actually performed. *See Cartner v. Alamo Grp., Inc.*, No. 1:07-cv-1589, 2012 WL 7681282, at *7 (N.D. Ohio Feb. 6, 2012) (identifying issues associated with attorneys' fee awards, including "factual questions about whether the work was actually performed" and "legal questions about whether the work performed was sufficiently related to the issues on which the plaintiff prevailed"). Here, Alps fails to identify how, or when, Shumaker performed work litigating the unenforceability of the '688 and '182 patents given that those patents were not addressed in the amended counterclaim or at trial. (*See* Sept. 24, 2014 Op. & Order at 79; Feb. 19, 2016 Fed. Cir. Decision at 18 ("As the district court noted, [the '688 and '182] patents have never been at issue in this litigation . . . .").)[.]

(*Id.*) The Court, therefore, has already found that the requirements outlined in *Cohen* are met and the additional factors analyzed by Ohio courts support Shumaker's request. Furthermore, the Court has already found that the equities in this case, therefore, favor the imposition of a lien. (*Id.*)

Re-analyzing whether the requirements in *Cohen* and the additional factors are met after the evidentiary hearing, the Court finds that the equities in this case still favor the imposition of a lien. The evidence adduced at the hearing makes apparent that this case was a "bet the company" litigation for Alps. Ronald Christaldi testified that if Alps had lost the litigation, it would have gone out of business. (ECF No. 330 ["Evid. Hearing Day 1 Transcript"], Testimony of Ronald Christaldi, at pg. 30.) Stephen Chappelear, Shumaker's expert, confirmed that Alps would go out of business if it experienced adverse result and that this was a "bet the company" case. (Evid. Hearing Day 1 Transcript, Testimony of Stephen Chappelear, at pg. 160.) Shumaker litigated the case to judgment, including drafting a motion for summary judgment,

litigating an appeal to the Federal Circuit, trying the inequitable conduct portion of the case, obtaining a judgment for Alps, and defending that judgment in the second appeal to the Federal Circuit. (ECF No. 299, at pg. 2–3.) Furthermore, Mr. Ronald Christaldi, now a partner at Shumaker, met with Dr. Aldo Laghi, the President of Alps, *weekly beginning in 2005 up until the end of the representation*. (Evid. Hearing Day 1 Transcript, Testimony of Ronald Christaldi, at pg. 31 [emphasis added].) Shumaker's services and skill indisputably led to the funds on which they now move for a charging lien. The *Cohen* factors are met.

The Undersigned also finds that the additional factors under *Fire Protection Resources* are also met. The Court first considers the right of the client to be heard on the merits. At this point, Alps has obtained new counsel and has filed a response in opposition to the original Motion (ECF No. 300), a Motion for Reconsideration of the Court's Order on the Motion for Charging Lien (ECF No. 307), participated in a two-day long evidentiary hearing, and filed a post-hearing brief (ECF No. 333). Alps has unquestionably been heard on the merits and had the opportunity to obtain counsel to litigate the claim for attorney fees. Furthermore, Alps presented three witnesses at the evidentiary hearing, and has therefore been offered a forum for the presentation of witnesses. Alps has not put forward evidence that indicates Shumaker has engaged in inequitable conduct that causes the Court to question whether Shumaker should be permitted to invoke the Court's equitable jurisdiction. Moreover, if the Court permits Shumaker to assert its charging lien on the settlement funds between Alps and OWW, it may resolve a separate lawsuit between Shumaker and Alps for the recovery of attorney's fees and expenses, thereby potentially eliminating unnecessary and duplicative litigation. As in the Court's prior Order on the Motion for Charging Lien, neither party has objected to the propriety of an order as opposed to a judgment in regard to the unpaid attorney's fees and expenses.

Assessing the equitable nature of the proceeding, Alps has failed to put forward sufficient evidence to shift the balance of equities in its favor.  For example, Shumaker discounted its rates below prevailing market rates for Alps.  Ronald Christaldi testified that when he began working for Shumaker, he kept the rate the same for clients that transitioned with him, despite the rate being lower than market rates.  (Evid. Hearing, Day 1 Transcript, Testimony of Ronald Christaldi, at pg. 49.)  Furthermore, Ronald Christaldi testified that even when Shumaker raised Alps' rates, the rates were still discounted from prevailing market rates.[2]  (*Id.* at pg. 50.)  Indeed, Thomas Shunk, Alps' expert, testified that he did not hold the opinion that any of the rates at issue were unreasonable as compared to market rates.  (Evid. Hearing Day 2 Transcript, Testimony of Thomas Shunk, at pg. 89.)

When Shumaker did increase its rates, the great weight of the evidence indicates that no one at Alps, including Dr. Laghi, ever questioned or complained about the rate increases.  (*Id.*, Testimony of Ronald Christaldi, at pg. 50, 54–55; Testimony of David Wicklund, at pg. 135–36; Testimony of Stephen Chappelear, at pg. 157; Evid. Hearing Day 2 Transcript, Testimony of Aldo Laghi, at pg. 29.)  Moreover, Shumaker advised in its engagement letter specifically that, "If you ever have questions regarding our statements or the services which are being rendered, please advise us promptly so that we may address your concern and take appropriate action to meet your expectations."  (Evid. Hearing Day 1 Transcript, Testimony of Ronald Christaldi, at pg. 54.)  Opposing a Motion for a Charging Lien years after the fact does not constitute prompt advisement.  *See Franklin & Marbin, P.A. v. Mascola*, 711 So. 2d 46, 51–52 (4th Dist. Fla. 1998) ("[T]he client's failure to object seasonably to the hours as they were billed would waive

---

[2] Additionally, David Wicklund who works at Shumaker, testified that Alps was given a discount of $98,068.12 over the course of the second half of the case.  (Evid Hearing Day 1 Transcript, Testimony of David Wicklund, at pg. 129.)

any objection to the number of hours billed and would operate as a tacit admission of the reasonability thereof in a later suit for a money judgment under the contract.")[3]  Furthermore, Shumaker gave notice in the engagement letter that rates would be periodically adjusted.  (*Id.* at pg. 49.)

Accordingly, because the requirements in *Cohen* and the additional factors are met, the Undersigned **RECOMMENDS** that Shumaker's request be **GRANTED** and the attorneys' fees by Shumaker be found reasonable and awarded.

## B.  Lodestar Analysis

Alps does not dispute that Shumaker is owed payment.  Rather Alps disputes the amount of payment Shumaker is owed.  (ECF No. 333.)  Alps argues that the Court should undertake a lodestar calculation in determining what Alps owes Shumaker for its services.[4]  (*Id.*)  Ohio law does not support this assertion.  Rather, case law suggests that the analysis is controlled by *Cohen*.  *See Cuyahoga Cty. Bd. of Commrs. v. Maloof Properties, Ltd.*, 968 N.E.2d 602, 715 (8th Dist. Ohio 2012) ("Courts have strictly applied the requisites spelled out in . . . *Cohen*, noting that this interpretation is preferable to a 'but for' test[.]"); *see also Reid, Johnson, Downes,*

---

[3] Although *Mascola* is a Florida case, Alps is a Florida business entity and entered the engagement with Shumaker in Florida.  However, whether Florida or Ohio law governs the fee dispute is inapposite, as the same result follows in either jurisdiction in that both hold that a client must timely object to invoices.  *Thompson, Hine and Flory v. Pingue Properties, Inc.*, 1996 WL 145490, at *4 (10th Dist. Ohio 1996) (finding the attorney's hourly rates to be reasonable and noting that the client never objected to the attorney's invoices prior to terminating the attorney's services).

[4] Alps also indicates in its post-hearing brief that the Court asked the parties to clarify whether the standard involves a detailed line-by-line approach or a holistic approach when reviewing the billing invoices.  This assertion is not accurate.  The Court requested the following: "[W]hat I would like is to at least have some briefing as to the standard, [and] if the parties want to make some summation type of argument."  (Evid. Hearing Day 2 Transcript, at pg. 131.)  Accordingly, the Undersigned does not find it pertinent, at this juncture, to address Alps' arguments related to a line-by-line versus holistic approach to viewing billing invoices.

*Andrachik & Webster v. Lansberry*, 629 N.E.2d 431, 436–37 (Sup. Ct. Ohio 1994) (totality of

circumstances surrounding each situation should be considered in determining reasonable value

of discharged contingent-fee attorney services in *quantum meruit*).[5]  In fact, a charging lien "is

not a true lien."  *Hill Hardman Oldfield, L.L.C. v. Gilbert*, 944 N.E.2d 264, 268 (9th Dist. Ohio

2010).  It is, rather, "[t]he right of an attorney to payment of fees earned in the prosecution of

litigation to judgment, though usually denominated a lien, *rests on the equity* of such attorney to

be paid out of the judgment by him obtained, and is upheld on the theory that his services and

skill created the fund."  *Id.* (quotation omitted) (emphasis added).

Case law outside the state of Ohio supports the assertion that the lodestar analysis is not a

suitable method for determining the appropriate amount of an attorney charging lien in the case

at hand.  For instance, in Florida, while the lodestar method is used to calculate a "reasonable

attorney's fee," it is required only for fees imposed upon a losing party.  *Searcy, Denney,

Scarola, Barnhart & Shipley, P.A. v. Poletz*, 652 So.2d 366, 368–69 (Sup. Ct. Fla. 1995).

However, "[w]hen determining a *quantum meruit* award in other circumstances, Florida courts

must take into account the actual value of the services to the client, and consider the totality of

---

[5] Unlike *Reid*, this case is not a contingency fee dispute.  (Evid. Hearing Day 1 Transcript, at pg.
109 [Counsel for Shumaker at Hearing: "But is your fee agreement in this case a contingent fee
agreement?; Previous Counsel for Alps: "No. It was an hourly fee basis."]; Evid. Hearing Day
2 Transcript, at pg. 8 [Counsel for Shumaker at Hearing: "We all know it's not a contingent fee
case."].)  Regardless, because *Reid* indicates that Ohio law rejects the use of the lodestar
method in computing reasonable attorneys' fees in contingency fee cases involving a charging
lien, it supports Ohio law's preference of an analysis of the *Cohen* factors in all charging lien
cases.  Furthermore, Alps is a Florida business entity and entered the engagement with
Shumaker in Florida.  (ECF No. 332, at pg. 7.)  The Supreme Court of Florida has explicitly
held that the lodestar method of computing reasonable attorneys' fees should not be applied in
contingency fee cases.  *Searcy, Denney, Scarola, Barnhart & Shipley, P.A. v. Poletz*, 652 So.2d
366, 368–69 (Sup. Ct. Fla. 1995) ("The conventional lodestar approach is ill-suited for the task
of assessing attorney's fees due as damages for breach of an agreement for the payment of fees
because it does not allow for consideration of the totality of the circumstances surrounding the
professional relationship.") (internal quotations and citation omitted).

the circumstances surrounding the litigation." *Freeman v. Clarke Cty.*, No. 4:08-cv-139, 2012 WL 6569378, at *11 (S.D. Miss. Dec. 16, 2012), *aff'd*, 620 F. App'x 223 (5th Cir. 2015) (citing *Searcy*, 652 So.2d at 369.)[6]

Accordingly, based on state of Ohio case law, as well as case law outside the jurisdiction, the Undersigned declines to recommend that the Court use the lodestar analysis here, finding the *Cohen* analysis sufficient. Nevertheless, even if the Court did employ the lodestar analysis, the Undersigned would still recommend that Shumaker's request be granted and that its attorneys' fees be found reasonable.

"The starting point for determining the amount of reasonable attorney fees is the 'lodestar amount' which is calculated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate." *Imwalle v. Reliance Med. Prods. Inc.*, 515 F.3d 531, 551–52 (6th Cir. 2008) (citing *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). In the Sixth Circuit, district courts apply a lodestar calculation based on the "prevailing market rate in the relevant community" when considering the reasonableness of the fee award. *Smith v. Serv.*

---

[6] New York case law indicates that use of the lodestar approach in assessing the amount of a charging lien is permittable because the lodestar analysis is "sufficiently congruent with the criteria applicable under New York law to justify such a choice of calculation methodology[.]" *Kovach v. City University of New York*, 2015 WL 5827414, at *2 (S.D. NY Oct. 6, 2015) (citation omitted). Furthermore, the Second Circuit has ruled that while "[i]t is undisputed that it [is] proper to determine the amount of [a] charging lien on a *quantum meruit* basis," it is not an abuse of discretion for a trial court to use a lodestar analysis "to assist in calculating the reasonable value of [an attorney's] services." *See, e.g.*, *Sequa Corp. v. GBJ Corp.*, 156 F.3d 136, 148–49 (2d Cir. 1998). Similarly, the Eleventh Circuit has indicated that "[w]hile a lodestar calculation is not an improper starting point," the court must still consider the totality of the circumstances, particularly the benefit conferred on the client. *Buckley Towers Condominium, Inc. v. Katzman Farfinkel Rosenbaum, LLP*, 519 F. App'x 657, 665 (11th Cir. 2013). In 2008, though, the Second Circuit abandoned the lodestar approach in favor of the "presumptively reasonable fee" analysis, where the district court is directed "to bear in mind *all* of the case-specific variables" identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate. *Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. Of Albany & Albany Cty. Bd. of Elections*, 522 F.3d 182, 190 (2d Cir. 2008).

*Master Corp.*, 592 F. App'x 353, 369 (6th Cir. 2014) (citing *Adcock-Ladd v. Sec'y of Treasury*,

227 F.3d 343, 350 (6th Cir. 2000)). The calculation considers "the number of hours reasonably

spent on the case by an attorney times a reasonable hourly rate." *Smith*, 592 F. App'x at 369.

The resulting sum may be adjusted to reflect factors such as the "results obtained." *Hensley*, 461

U.S. at 434 (quoting *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.

1974)); *Gonter v. Hunt Valve Co., Inc.*, 510 F.3d 610, 621 (6th Cir. 2007). "Determining a

'reasonable attorney's fee' is a matter that is committed to the sound discretion of a trial judge."

*Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 558 (2010).

Upon review, the Undersigned concludes that the fees sought are reasonable. Alps

asserts that in doing a lodestar analysis the proper amount to award Shumaker would be

$375,840.55.[7] (ECF No. 333, at pg. 5.) Alps reaches the conclusion that $375,840.55 is

sufficient based on the opinion of Mr. Thomas Shunk, who testified at the evidentiary hearing.

The Court affords Mr. Shunk's opinion little weight. Mr. Shunk had never before testified as an

expert on the reasonableness of attorneys' fees. (Evid. Hearing Day 2 Transcript, Testimony of

Thomas Shunk, at pg. 86.)[8] Additionally, Mr. Shunk's experience in patent litigation cases and

fees involved party-versus-party fee claims, rather than client-versus-attorney fee claims. (*Id.*)

Furthermore, Mr. Shunk reached the $375,840.55 amount by arbitrarily reducing certain hours

worked by Mr. Christaldi and Mr. Wicklund, attorneys from Shumaker, because he believed that

---

[7] Alps goes on to reduce this to $300,000, by supposedly applying factors from *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974) and Ohio Rule of Professional Conduct 1.5. (ECF No. 333, at pg. 5.) The Court notes that the *Johnson* case is not binding because it is from outside the Sixth Circuit.

[8] Mr. Shunk has served in the role of an expert witness only once previously for which he provided a report, but did not testify, about attorneys' fees in a patent infringement case that was the subject of arbitration. (Evid. Hearing Day 2 Transcript, Testimony of Thomas Shunk, at pg. 45.)

the time entries were not detailed enough or that the attorneys worked longer than eight hours in a single day. Mr. Shunk testified that he "looked through" but "did not study in detail" the fees submitted by Shumaker from 2011-2013 that Alps paid, the fees in the inequitable conduct portion of the case, and the fees currently being disputed. (*Id.* at pg. 47.)

Mr. Shunk also testified that he looked at the American Intellectual Property Law Association ("AIPLA") survey, which he testified "is the industry standard in the intellectual property field" in regard to fees. (*Id.* at pg. 49.)[9] Mr. Shunk further indicated that he created his own spreadsheet of Shumaker's bills. (*Id.* at pg. 50–52.) In the chart, Mr. Shunk "revised the hours [worked] to a number of hours [he] thought was more reasonable," in addition to adjusting some of the hourly rates. (*Id.* at pg. 51–52.) Mr. Shunk testified it was from this chart, where he arbitrarily reduced certain hours worked and hourly rates, that he determined that Shumaker should only be owed approximately $375,000. (*Id.* at pg. 52.) Mr. Shunk then testified that based on his analyses, although Shumaker billed Alps approximately $614,000, he concluded that a reasonable fee should not exceed $300,000. (*Id.* at pg. 54.)

In terms of the hourly rates, Mr. Shunk testified that he did not "have a problem" with yearly increases in the fifteen to twenty-five-dollar range. (*Id.* at pg. 58–59.) Mr. Shunk specifically testified that these types of raises are common in the industry. (*Id.* at pg. 59.) Mr. Shunk indicated, however, that he did have an issue with the rate increases in November of 2013 because they occurred in the middle of the year whereas all of the other rate increases occurred at

---

[9] Mr. Shunk testified about how the AIPLA is developed: "[T]he American Intellectual Property Lawyers Association, which is the primary national organization for intellectual property law, solicits information from its members every year in a very detailed way to find out what hourly rates are being charged, what the costs of litigation broken down to different types of intellectual property litigation might be, and it's a really useful guide to what the industry standard for doing these cases is." (Evid. Hearing Day 2 Transcript, Testimony of Thomas Shunk, at pg. 49.)

the start of each fiscal year, and it was a one-hundred-dollar per hour rate increase. (*Id.*) Mr. Shunk provided no testimony regarding whether middle-of-the-year and one-hundred-dollar per hour rate increases were common in the industry. He simply testified that from his perspective, he took issue with the particular increase in November 2013. (*Id.*) Mr. Shunk, however, did confirm that he was not taking issue with the rates themselves, but rather on the amount of the increase from the initial engagement. (*Id.* at pg. 90.)

Furthermore, Mr. Shunk said that while he reduced Mr. Christaldi and Mr. Wicklund's rates on his chart around this time because they did not strike him as reasonable, he did not change the rate of another staff member, Ms. Richter, because "she was only in there for a few months anyway." (*Id.* at pg. 60.) Mr. Shunk did not explain why it would be appropriate to change some staff members' rates in his analysis but leave other staff members' rates the same simply because they did not work on the case as long.

Mr. Shunk also took issue with the reasonableness of Shumaker's fees when a timekeeper's description for an activity was general or non-descriptive. (*Id.* at pg. 63.) He also opined that when there was a substantial amount of time spent and the description was general and nondescriptive, it was a "red flag of an inadequate billing statement." (*Id.*) Mr. Shunk further testified that while there is nothing "inherently wrong with billing more than eight hours in a day," he would have staffed the case leaner than Shumaker did for the Alps case. (*Id.* at pg. 69.) Indeed, Mr. Shunk admitted that he had not looked for any authority for the proposition that an attorney billing for eight hours a day is not reasonable. (*Id.* at pg. 97.) However, Mr. Shunk did take issue with attorneys billing more than eight hours where the description for the work was "attend trial" because, in his opinion, the actual trial itself would not likely go on for more than eight hours in a single day. (*Id.*) In terms of when Mr. Shunk reduced attorney hours

because they exceeded eight hours in a day, he testified that he did not reduce the hours of support people on his chart because he "felt it was probably highly likely they were spending that kind of time." (*Id.* at pg. 70.) However, Mr. Shunk did reduce some people's hours in his analysis, including Mr. Christaldi's on certain days when the time billed exceeded eight hours. (*Id.*)

Mr. Shunk testified that besides the lodestar approach he also tried "to get a sense of what were the goals to be achieved through this litigation and what would a reasonable strategy to achieve those goals have been." (*Id.* at pg. 72.) Mr. Shunk further testified that while he heard no testimony he "imagined" that a strategy meeting between Dr. Laghi and Mr. Christaldi would have taken place after the first Federal Circuit opinion came down. (*Id.*) Indeed, Mr. Shunk confirmed that he had not seen or heard of any written strategy, nor had he seen or heard of any written budget for such a strategy. (*Id.*) Nonetheless, Mr. Shunk reached particular conclusions in regard to what a "reasonable strategy" would have been. (*Id.*) Mr. Shunk opined that a budget of no more than $300,000 should have been put towards the continued litigation of the issues that remained in the case. (*Id.* at pg. 72–73.) Mr. Shunk testified that his reasoning for limiting the budget was that at this point in the litigation it was no longer a "bet the company" case and the only reason to seek a finding of inequitable conduct was to obtain attorneys' fees. (*Id.* at pg. 73–74.) Mr. Shunk also testified that he did not believe it was likely that more than $650,000 would be recovered in the inequitable conduct proceeding. (*Id.* at pg. 79.) Mr. Shunk, therefore, opined that it would not be reasonable to have a client pay more than $650,000 to only recover $650,000. (*Id.*)

In addition to this "reasonable strategy" approach and the lodestar analysis, Mr. Shunk testified that he also looked at the 2017 AIPLA Report as a "sanity check on the other two

approaches." (*Id.* at pg. 82.) Mr. Shunk testified that he specifically looked at the median litigation costs when less than a million dollars was at risk. (*Id.* at pg. 82–83.) In 2013, Mr. Shunk testified that the median total cost was $700,000 and the cost of the case through the initial phase was $350,000. (*Id.* at pg. 84.) Mr. Shunk testified that in Shumaker's litigation of inequitable conduct, the initial phase costs were unnecessary because those "had been done and paid for" already. (*Id.* at pg. 83–84.) Mr. Shunk, therefore, testified that he subtracted the initial costs of $350,000 from the total of $700,000, leaving costs of $350,00 which he testified "was very close to the lodestar number [he] came up with." (*Id.* at pg. 84.) Mr. Shunk testified that he did not think this was conclusive, but rather showed that his other conclusions were reasonable. (*Id.*)

Neither Mr. Shunk, nor Alps, puts forth evidence or case law that supports reducing hours for any of these reasons. While Alps does point to *Hensley v. Eckerhart*, 461 U.S. 424 (1983), for the proposition that a district court should exclude hours that were not "reasonably expended" by counsel, Alps fails to acknowledge that the Supreme Court of the United States has held that "[t]here is no precise rule or formula" in making reasonable hour determinations. *Id.* at 436. Furthermore, the "essential goal . . . is to do rough justice, not to achieve auditing perfection." *Fox v. Vice*, 563 U.S. 826, 838 (2011). Accordingly, Mr. Shunk's opinion is given little weight.

Alps also argues that in November 2013, when the Federal Circuit remanded the case back to this Court for a trial on inequitable conduct Alps, if they were successful and entitled to recover attorneys' fees, "stood to gain no more than about $650,000 in fees from OWW." (ECF No. 333, at pg. 11.) Alps, therefore, argues that it was unreasonable for Shumaker to cause Alps to incur $639,000 in fees when Alps could gain "no more than about $650,000[.]" (*Id.*)

Subsequently, Alps indicates that the possible recovery was "no more than $658,000[,]" however. (*Id.* at pg. 12.) However, monetary recovery was not the only reason to pursue a trial on inequitable conduct. Ronald Christaldi testified that the benefits of pursing that ruling included that it would act as a "poison pill" that would invalidate all of the claims in the still-pending lawsuits, and that it would aid Alps in a public-relations perspective since its reputation in the industry had been hurt by the lawsuit. (Evid. Hearing Day 1 Transcript, Testimony of Ronald Christaldi, at pg. 43.)

David Wicklund also testified about the benefits of pursing the litigation. Although he acknowledged that one of the benefits of pursuing a finding of inequitable conduct against OWW was that Alps would have had a right to recover attorney fees, he emphasized that there were other benefits as well. He noted that Alps had a pending antitrust claim against OWW which was premised on the fact that there had been inequitable conduct at the patent office. He indicated that if Alps had not won on the issue of inequitable conduct in this litigation, the antitrust claim would have gone away completely. (*Id.*, Testimony of David Wicklund, at pg. 132.) Mr. Wicklund also testified that the ruling was important to Alps' reputation. He indicated that Alps had been sued by OWW and accused of infringement and its customers were being told Alps infringed. He explained that by obtaining an inequitable conduct finding, essentially a finding that OWW committed what amounted to fraud on the patent office to get the patent, it would put the onus on OWW, not Alps, "for this whole mess." (*Id.*) Under these circumstances, Alps' argument that it stood to gain only attorneys' fees by pursuing the litigation is unsubstantiated.[10]

---

[10] Alps' central argument that it stood to recover no more than roughly $658,000 in attorneys' fees is incorrect. But Alps stood to recover *all* of the attorneys' fees it had incurred since September 30, 2011, after the second reexamination. The total available fee award was closer

Accordingly, the Undersigned does not find Mr. Shunk's analysis of the fees owed to Shumaker persuasive. Instead, a review of the lengthy docket in this case, and the testimony provided at the evidentiary hearing, demonstrates that Shumaker expended a reasonable number of hours litigating this case. The evidence reveals that this case was a "bet the company" litigation for Alps, and Shumaker was highly successful in its services and efforts. (Evid. Hearing Day 1 Transcript, Testimony of Ronald Christaldi, at pg. 30.) The Court credits and assigns great weight to the opinions of Stephen Chappelear, Shumaker's expert. Mr. Chapppelear testified that "[T]his was part of an ongoing dispute between [OWW and Alps] going on for many years in different forums. And so there was a great deal at stake, multiple millions of dollars, and so that certainly is an issue that would lead to why you would hire a topflight firm like Shumaker, Loop & Kendrick and why they would spend the amount of time they did pursuing the activities that they did." (*Id.*, Testimony of Stephen Chappelear, at pg. 160.)

Mr. Chappelear has been serving as an expert witness on attorneys' fees for more than twenty years. (*Id.* at pg. 150.) Mr. Chappelear came to a different conclusion than Mr. Shunk. (*Id.* at pg. 154, 157–58, 164.) Mr. Chappelear indicated that his opinion was that the fees and services rendered by Shumaker that resulted in those fees were "reasonable and necessary." (*Id.* at pg. 151.) He also testified "that the time spent by the individual lawyers and paralegals on the matter was reasonable for the matters undertaken." (*Id.* at pg. 157.) Mr. Chappelear further indicated that "both the hourly rates charged by the individual timekeepers and then the fees as reflected on the invoices were reasonable for litigation conducted in this locale." (*Id.* at pg. 154.)

---

to $1.3 million. (*See* Evid. Hearing Day 1 Transcript, Testimony of Stephen Chappelear, at pg. 184.)

Mr. Chappelear testified that his opinion that these services were reasonable and necessary was based on the fact that this was a "tooth-and-nail fought litigation" in that Alps would likely have gone out of business if it had lost. (*Id.* at pg. 153.) He also testified that the burden for a finding of inequitable conduct was very high, which necessitated Shumaker to do the work to meet that burden. (*Id.* at pg. 153–54.) Furthermore, Mr. Chappelear testified that the issues were novel and complex, both factually and legally. (*Id.* at pg. 154.)

In terms of the hours worked and the rates charged, Mr. Chappelear testified that the rates charged by Shumaker's timekeepers were reasonable for the locale. (*Id.* at pg. 155–56.) Furthermore, Mr. Chappelear reasoned that it is customary for law firms to adjust their rates from time to time and he had no concern about the increases in the rates at issue in this case. (*Id.* at pg. 156.) Additionally, Mr. Chappelear testified that he had seen no evidence of any complaints by Alps as to either the hourly rates or to any increases in the hourly rates. (*Id.* at pg. 157.) Mr. Chappelear testified that instances where lawyers billed more than eight hours in a day did not cause him any concern because it would not be unusual on days an attorney spent traveling, preparing for trial, or attending trial. (*Id.* at pg. 158.) Mr. Chappelear testified that in his experience he would be "shocked" to see someone only charging eight hours during a trial day. (*Id.*) In regard to the descriptions which Mr. Shunk found inadequate, Mr. Chappelear testified that there has been a trend in the circuit courts and at the United States Supreme Court "in not focusing so much on the intricacies of an individual entry on a time sheet." (*Id.* at pg. 162.) Furthermore, he testified that in his experience descriptions like "prepare for trial" or "attend trial" are traditional, acceptable, and reasonable. (*Id.* at pg. 164.)

Importantly, unlike Mr. Shunk's analysis, Mr. Chappelear did not base his opinions on the false premise that assessing the charging lien required use of the lodestar analysis.

Moreover, given the generous discounts provided to Alps, and the fact that Shumaker continued to work on the case even when Alps had fallen behind on payments, a true lodestar analysis may well indicate that Shumaker reasonably would be owed *more* than the requested $639,946.18. (Evid. Hearing Day 1 Transcript, Testimony of Ronald Christaldi, at pg. 49, 50, 53; Testimony of David Wicklund, at pg. 129; Evid. Hearing Day 2 Transcript, Testimony of Aldo Laghi, at pg. 28.)  Accordingly, Mr. Chappelear's testimony is given great weight.

**IV.**

For the foregoing reasons, the Undersigned **RECOMMENDS** that Shumaker's request be **GRANTED** and Shumaker's attorneys' fees be found reasonable and awarded.  The Undersigned, therefore, **RECOMMENDS** the imposition of a $639,946.18 attorney charging lien on any settlement funds paid to Alps in this matter.

## PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district

court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation). Even when timely objections are filed, appellate review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted).

Date: May 28, 2019

/s/ *Elizabeth A. Preston Deavers*
**ELIZABETH A. PRESTON DEAVERS**
**CHIEF UNITED STATES MAGISTRATE JUDGE**